INLAND STEEL INDUSTRIES, INC., AK Steel Corporation, Bethlehem Steel Corporation, LTV Steel Company, Inc., National Steel Corporation, and U.S. Steel Group—A Unit Of USX Corporation, Plaintiffs–Cross Appellants,

and

Geneva Steel, Gulf States Steel, Inc. of Alabama, Laclede Steel Company, Lukens Steel Company, Sharon Steel Corporation, and WCI Steel, Inc., Plaintiffs,

v.

UNITED STATES, Defendant–Appellee,

v.

Usinor Sacilor (now known as Usinor), Sollac, and GTS, Defendants–Appellants.

Nos. 98–1230, 98–1259.

United States Court of Appeals, Federal Circuit.

Aug. 24, 1999.

John A. Ragosta and John R. Magnus, Dewey Ballantine LLP, argued, for plain-tiffs-cross appellants. Of counsel were Michael H. Stein and Dominic L. Bianchi.

Reginald T. Blades, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued, for defendant-appellee. With him on the brief was David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel; Elizabeth C. Seastrum, Senior Counsel; and Terrence J. McCartin, Senior Counsel, Office of Chief Counsel for Import Administration, U.S. Department of Commerce. Of counsel were Bernd G. Janzen, and Myles S. Getlan, Attorneys, U.S. Department of Commerce.

Stuart M. Rosen, Weil, Gotshal & Manges LLP, argued for defendants-appellants. With him on the brief were M. Jean Anderson, Gregory Husisian, and Jonathan Bloom.

Before RICH,* NEWMAN, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Usinor et al. appeal from the decision of the United States Court of International Trade which sustained several determinations of the Department of Commerce in an investigation of Usinor's importation of certain steel products. Inland et al. also cross-appeal from several of Commerce's determinations. *See British Steel PLC v. United States,* 879 F.Supp. 1254 (Ct. Int'l Trade 1995) (*British Steel I* ); *British Steel PLC v. United States,* 929 F.Supp. 426 (Ct. Int'l Trade 1996) (*British Steel II* ); *Inland Steel Indus., Inc. v. United States,* 967 F.Supp. 1338 (Ct. Int'l Trade 1997) (*Inland Steel* ). We affirm in all respects.

## BACKGROUND

Usinor is a French company with domestic and international steel-producing facilities. In the mid 1970s, the French government embarked upon a multi-faceted program to help French steel-producing

---

* Circuit Judge Rich heard oral argument in this case, but died on June 9, 1999. This case was decided by the remaining judges in accordance with Fed. Cir. R. 47.11.

companies, including Usinor, to restructure their massive debts. This appeal concerns the countervailability of certain of those programs, as well as Commerce's methodology for assigning the effects of such countervailable subsidies to Usinor's production. We begin by discussing each of these programs and Commerce's and the trial court's treatment of them.

### A. The Programs Under Investigation

#### 1. PACS and FIS Instruments

As part of this restructuring, the French government became the holder of PACS[1] and FIS[2] instruments. Usinor was obligated under the PACS instruments to pay to the French government the face value of the PACS, plus interest according to the following terms: for the first five years, Usinor was obligated to pay interest at a rate of 0.1%; after the first five years, the interest rate increased to 1.0%, and additionally, Usinor was to make principal payments and supplementary interest payments from its profits in amounts to be set by the French Minister of Economy. *See* Final Affirmative Countervailing Duty Determinations: Certain Steel Products From France, 58 Fed.Reg. 37304, 37307 (1993) (*Final Determination II* ).

The FIS instruments were bonds issued to the French government's Steel Intervention Fund (*i.e.*, the FIS). Usinor was obligated under the FIS instruments to pay the FIS interest at a rate of 0.1% plus an additional percentage dependent upon Usinor's profits. The FIS instruments carried a repayment schedule of fifteen annual principal repayments, the first two of which were to be made by the French government. The French government also acted as a guarantor in the event that Usinor did not meet its principal repayment obligations.

Usinor converted these instruments into common stock in the late 1980s, thus raising the question whether the conversion of these instruments to equity constituted a countervailable event. This in turn depends on whether the instruments constituted debt or equity at the time of their issuance, with conversion of only the former constituting a countervailable event. If the instruments were debt on issuance, then their conversion would constitute a subsidy by virtue of the forgiveness of the interest and the principal payments previously required. To determine whether these instruments constituted debt or equity at issuance, Commerce employed a four-factor test which explored: "(1) Expiration/Maturity Date/Repayment Obligation, (2) Guaranteed Interest or Dividends, (3) Ownership Rights, and (4) Seniority." Final Affirmative Countervailing Duty Determination: Certain Steel Products From Austria, 58 Fed.Reg. 37217, 37254 (1993) (*Final Determination I* ).[3] Under this

---

**1.** "PACS" is a French acronym for "prêts à charactéristiques spéciales," or loans with *special characteristics.*

**2.** "FIS" is a French acronym for "fonds d'intervention sidérurgique," or steel intervention funds.

**3.** Commerce explained the relevance of the four factors as follows:

Loans typically have a specified date on which the last remaining payments will be made and the obligation of the company to the creditor is fulfilled. Even if the instrument has no pre-set repayment date, but a repayment obligation exists when the instrument is provided, the instrument has characteristics more in line with loans than equity. Equity, on the other hand, has no expiration date. The rights to ownership theoretically extend to infinity.

If after applying the first [factor], we are unable to establish whether the hybrid instrument is debt or equity, we will turn to the second [factor]. Debt instruments guarantee the creditor a certain payment (i.e., the firm is obligated to pay). The rate may be fixed or variable but the requirement for, or schedule of, payments is predetermined. Any interruption in payment results in a default on the loan by the company. Equity on the other hand, has no guaranteed return. Companies are not required to issue a dividend to their stockholders. There is no counterpart to default for failure to pay a dividend on equity by the company.

The next [factor] in the hierarchy is ownership rights. Equity, unlike debt, confers ownership rights. Stockholders also have a claim on the profits of the firm, manifested

test, Commerce considered the four factors in the hope of finding a factor that was clearly indicative of the debt or equity status of the instrument. *See id.* ("Once a [factor] is clearly indicative of debt or equity, we will stop our analysis and categorize the hybrid as debt or equity.").

Commerce accordingly characterized the PACS and FIS instruments as debt at the time of issuance. Specifically, Commerce determined that the PACS instruments "carr[ied] an obligation for repayment, even though there was no determined maturity date." *Id.* at 37255. Commerce also noted that the PACS "instruments have guaranteed interest payments." *Id.* Commerce determined that the FIS instruments "have a fixed amortization schedule," and noted that the "fact that the [French Government] met the amortization schedules on these bonds for [Usinor] is irrelevant when analyzing whether the instruments constitute debt or equity." *Id.* Because these instruments constituted debt at the time of issuance, their subsequent conversion to equity was deemed countervailable by Commerce.

On appeal, the court found Commerce's determination concerning the characterization of the PACS and FIS instruments to be supported by substantial evidence and affirmed:

> in the form of dividends or capital appreciation.
> Finally, the last [factor] in the hierarchy, seniority, refers to the order of reimbursement in case a company liquidates. The order of payment of funds from liquidated assets are as follows: taxes and administrative expenses, wages, creditors (secured, priority, and unsecured), and, lastly, shareholders.
> Following the hierarchy outlined above, if an instrument has an expiration/maturity date or a clear repayment obligation, it will be treated as a loan.
> The remaining three [factors] in the hierarchy should be used to classify the instrument if the first [factor] fails to provide a clear indication of the proper classification. A guaranteed payment, whether interest or dividend, is more characteristic of debt than equity and can be an important ele-

For the first five years after their issuance, the PACS contracts provide [that] the debtor is obligated to make interest payments at a rate of 0.1 percent. Additionally, the Court notes [that] the PACS contracts provide that after the passage of five years from the date of issuance, the debtor is obligated to repay the loan principal "according to a schedule" established by the Minister of Economy, who is to "define ... the amounts available for the loans with special characteristics, the allotment between supplementary remuneration and repayments." The Court also notes [that] the translations of the PACS contracts, which are part of the administrative record, contain terms such as "debt" and "repayment" which strongly suggest a debt, rather than an equity-type, arrangement.

The Court finds [that] the conditions established by the PACS contracts concerning repayment, as well as the language included in those contracts, support Commerce's determination the PACS constituted debt upon issuance. The fact that the PACS contained provisions making repayment contingent on [Usinor] earning a profit does not alter the Court's conclusion. While [Usinor's] repayment obligation was contingent on earning a profit, the company neverthe-

> ment in calculating the subsidy. Ownership rights are considered more important than seniority in this hierarchy because they are definite characteristics of equity whereas seniority exists in a continuum. In this continuum, creditors come before owners but there is no definite line of distinction as to where one begins and the other ends. In addition, unlike ownership rights where potential profit sharing could affect subsidy calculations, seniority plays no quantitative role in determining countervailable benefits. Seniority matters only when the company is liquidated, whereas ownership rights are significant throughout the life of the company. Seniority does, however, play a qualitative role in discerning debt from equity which is why it is included in the hierarchy.
> *Final Determination I* at 37254 (citations omitted).

less was subject to liabilities on the PACS contracts during the period contracts were *outstanding* prior to their conversion into common stock. Accordingly, the Court finds Commerce's determination [that] the PACS contracts were debt upon issuance is supported by substantial evidence on the record and is otherwise in accord with law.

With respect to the FIS bonds, the Court notes the parties agree [that] these instruments contain a fixed payment schedule. The Court is not persuaded, however, by [Usinor's] argument [that] the FIS bonds should be classified as equity instruments. While [Usinor] argues the GOF made the first few principal payments and guaranteed remaining principal payments in the event [that Usinor's] financial position did not improve, the fact remains Usinor Sacilor was at all times obligated to make interest payments on the bonds, and it was additionally responsible for repaying the bonds' principal. Accordingly, the Court rejects [Usinor's] arguments and finds Commerce's determination [that] the FIS bonds constituted debt upon their issuance is supported by substantial evidence on the record and is otherwise in accordance with law.

*Inland Steel*, 967 F.Supp. at 1373 (citations omitted).

### 2. *Shareholder Advances*

Beginning in 1982, the French Government supplied Usinor with grants, which were accounted for as shareholder advances. These advances carried no interest and no preconditions to the receipt of funds. *See Final Determination II* at 37307. Like the PACS and FIS instruments, the shareholder advances were eventually converted into common stock, *see id.*, again raising the question whether this conversion constituted a countervailable event and whether the advances were debt or equity at issuance.

To determine whether the shareholder advances constituted grants instead of either debt or equity, Commerce employed a three-factor test pursuant to which funds were considered grants if they were "provided without expectation of a: (1) Repayment of the grant amount, (2) payment of any kind stemming directly from the receipt of the grant (including interest or claims on profits of the firm (i.e., dividends) . . . ), or (3) claim on any funds in case of company liquidation." *Final Determination I* at 37254. Because no shares were received by the French Government in exchange for the advances, Commerce concluded that the advances were grants at the time of their issuance.

The court found Commerce's determination concerning the characterization of the shareholder advances to be supported by substantial evidence and affirmed:

> Despite [Inland's] statement that [Usinor] was "plainly obligated to repay the principal as they accounted for the [shareholders' advances] by creating a new 'liability' category on their balance sheet," [Inland fails] to point to any record evidence which definitively establishes the existence of a repayment obligation on the part of [Usinor]. Indeed, as [Usinor] notes, the record contains "no evidence of loan or repayment agreements, payment schedules or actual principal or interest payments being made, nor was there any other evidence tending to show that the [French Government] or [Usinor] contemplated a repayment obligation."

The Court also finds unpersuasive [Inland's] contention [that] the shareholders' advances should be considered debt based on [Usinor's] treatment of the advances on its balance sheets. In asserting [Usinor] treated the shareholders' advances as "long-term debt," plaintiffs cite to materials prepared by [Usinor] in responding to Commerce questionnaires in 1992. The Court notes, however, that contemporaneous financial statements and accompanying notes prepared by [Usinor] between 1982 and 1985 classify the shareholders' advances as either contributions set aside for a future capital increase or as other equity.

The Court additionally rejects [Inland's] argument that [Usinor's] conversion of the shareholders' advances to common stock in 1986 is inconsistent with its treatment of the advances as grants prior to the conversion. The Court finds [Usinor's] conversion of the grants into common stock in 1986 was made pursuant to [a French law] which requires the maintenance of [an] equity to stated capital ratio of one to two. The reclassification was necessary because [the law] counts only pure equity, not grants or quasi-equity, towards the mandatory ratio.

Finally, the Court rejects [Inland's] contention that under French law shareholders' advances create debts and must be treated as loans. While French law may generally provide [that] shareholders' advances create debts and must be treated as loans, the record evidence clearly establishes a different arrangement was reached between [Usinor] and the [French Government] with respect to the shareholders' advances at issue in this case. The Court finds Commerce's determination the shareholders' advances received by [Usinor] were grants when provided ... is supported by substantial evidence on the record and is otherwise in accordance with law.

*Inland Steel*, 967 F.Supp. at 1355–56 (citations omitted).

### 3. *Crédit National Loans*

 Over the years, Usinor obtained numerous long-term loans from Crédit National, a financial institution owned by the French Government. The countervailability of these loans turned on their "specificity." The concept of "specificity" refers to the extent to which a potential subsidy benefits a particular enterprise or entity. *See* 19 U.S.C. § 1677(5A)(D) (1994) (discussing the conditions pursuant to which a court can find "specificity" as a matter of law or as a matter of fact). Only specific subsidies are countervailable. *See id.* § 1677(5)(A). Thus, foreign governments are enabled to confer benefits on their citizenry generally without running the risk that such a benefit will be countervailable in exported products.

Commerce determined that the law creating Crédit National did not in any way limit the industries to which loans can be made. *See Final Determination II* at 37311. The court also reviewed Crédit National's annual reports to determine whether these loans were de facto provided to a specific enterprise or industry, but determined that they were not. *See id.* (noting that several other industries, in addition to the steel industry, received loans from Crédit National during the pertinent time periods). Commerce accordingly held that the loans were not specific and therefore not countervailable. *See id.*

The court rejected Inland's arguments to the contrary and found Commerce's determination concerning specificity to be supported by substantial evidence:

> [Inland] also challenge[s] Commerce's alleged failure to "identify the 'program' under which [Usinor's] loans were provided." ... According to [Inland], "it is unreasonable and wholly inconsistent with the Department's precedents to treat everything such an institution does as a single program." ...

The Court rejects [Inland's] arguments. The Court notes [that] the record contains verified information establishing the charts provided to and relied on by Commerce[,] in concluding [that] Crédit National loans are non-specific[,] include only information on loans originated by Crédit National. The other loans noted by [Inland], such as the FDES, CFDI, and ECSC loans, are administered by Crédit National but are not included in the figures upon which Commerce relied. Based on the fact [that] Commerce considered only loans originated by Crédit National, the Court finds Commerce properly classified the loans as constituting a single program....

[T]he Court finds Commerce's determination that Crédit National loans are non-specific is supported by substantial

evidence on the record and is otherwise in accordance with law.

*Inland Steel,* 967 F.Supp. at 1362–63.

### 4. Commerce's Use of "Equipment Loan" Interest Rates

■ To calculate the countervailable benefit flowing from certain long-term government loans, Commerce compared the interest rate on those loans to a benchmark interest rate. Because Usinor was determined to be "uncreditworthy" for the years in question, the benchmark loan, pursuant to regulations proposed in 1989 but not enacted, was to be the "highest long-term fixed interest rate commonly available" to firms in France, *see* 54 Fed. Reg. 23366, 23381 (1989) (Proposed Regulation § 355.44(b)(6)(iv)(A)(1)),[4] plus a risk premium to reflect Usinor's uncreditworthy status.

Commerce, after investigating the propriety of using several other rates, decided to use as the benchmark rate the "interest rates provided in the OECD Monthly Financial Statistics for Crédit National equipment loans." *Final Determination II* at 37314. On appeal, the court rejected Inland's arguments concerning the propriety of the use of the Crédit National "equipment loan" rate, and found Commerce's use of the rate to be supported by substantial evidence:

> First, [Inland] allege[s that] Commerce unreasonably departed from its Proposed Regulations, which require the use of the "highest long-term fixed interest rate commonly available to firms in the country in question" in calculating the benchmark and discount rates for an uncreditworthy company, when it utilized Crédit National's equipment loan rate in the Final Determination.... [Inland] also assert[s that] Commerce failed to comply with its past practice and the Proposed Regulations by utiliz-

ing a government source of financing in selecting a benchmark interest rate for [Usinor], noting "Crédit National ... is owned by, and makes its lending decisions wholly at the direction of, the [French Government]."....

The Court rejects [Inland's] arguments. First, with respect to [Inland's] contention [that] Commerce erred by failing to utilize the IMF [International Monetary Fund] lending rates, the Court notes [that] the Proposed Regulations specifically state [that] Commerce shall use "[t]he highest long-term fixed interest rate commonly available to firms in the country in question" in calculating the benchmark interest rate. *See* [Proposed Regulation § 355.44(b)(6)(iv)(A)(1) ]. The Court notes Commerce determined it would be inappropriate to use the IMF rates because they include "both short-term and long-term borrowing," and therefore do not fully satisfy the Proposed Regulations. Accordingly, the Court finds Commerce's determination not to utilize the IMF rates in calculating the benchmark interest rate for [Usinor] is supported by substantial evidence on the record and is otherwise in accordance with law.

The Court also finds [that] Commerce's use of a loan rate from a government-owned bank is appropriate. The Proposed Regulations provide [that] Commerce may use government rates "[w]here necessary" and when the government loans are determined to be non-specific. *See* [Proposed Regulation § 355.44(b)(7) ].... Accordingly, the Court finds Commerce's utilization of Crédit National's equipment loan rate in calculating [Usinor's] benchmark interest rate is supported by substantial evi-

---

4. The parties and the court both considered Commerce's proposed regulations to be significant. Because they were never enacted, we cannot afford those provisions the status of law. We will, however, consider them to be indicative of Commerce's normal practice in countervailing duty cases. *See* 54 Fed.Reg. 23366, 23366 (1989) ("These regulations codify much of the Department's existing practice with respect to the identification and measurement of subsidies under the countervailing duty ... law").

dence on the record and is otherwise in accordance with law.

*Inland Steel,* 967 F.Supp. at 1364–65.

### 5. FDES Loans

Prior to 1990, Usinor received loans from the Fonds de Dévelopement Économique et Social (FDES), a governmental entity. These loans were consolidated in 1990, resulting in a different loan structure and interest rate. This raised the issue whether the consolidated loan constituted a countervailable benefit. *See Final Determination II* at 37311. Commerce concluded that it did not because the interest rate charged on the consolidated FDES loan was consistent with the Crédit National's equipment loan benchmark interest rate, *see id.*, as discussed in the last section.

The court found Commerce's determination that the FDES loans were non-countervailable to be supported by substantial evidence and affirmed:

> [Inland] contend[s that] Commerce's determination that Crédit National's equipment loan rate reflects the cost of corporate long-term borrowing cannot form the basis for Commerce's selection of a benchmark rate....
>
> [T]he Court rejects [Inland's] assertion that Commerce improperly utilized the Crédit National equipment loan rates in calculating a benchmark interest rate based on its determination [that] the Crédit National rates "reflect the cost of corporate long-term borrowing,".... The Court notes the Proposed Regulations establish a two-track approach to selecting a benchmark interest rate, differentiating between calculating a company-specific benchmark rate and a country-wide benchmark rate. *See* [Proposed Regulation § 355.44(b)(4)(i)-(iii) ] (providing for the calculation of a company-specific benchmark interest rate based on a loan taken out, or a debt obligation issued, "by the firm receiving the government loan"); § 355.44(b)(4)(iv)-(v) (providing for the calculation of a country-wide benchmark interest rate based on "[t]he national"

long-term fixed or variable interest rate "in the country in question"). Because "[Usinor] did not report its actual cost for long-term fixed-rate debt," Commerce calculated a benchmark interest rate based on the country-specific provisions set out in the Proposed Regulations.

> Contrary to [Inland's] contention [that] Commerce improperly selected Crédit National's equipment loan rate as a benchmark based on its observation [that] those rates "reflect the cost of corporate long-term borrowing," the Court finds this is the type of consideration the Proposed Regulations intended Commerce to undertake. As [Inland] note[s] "the very purpose of selecting a benchmark interest rate is to estimate the loan recipient's alternative (unsubsidized) cost of loan capital." The Court observes that in determining [that] the Crédit National equipment loan rates "reflect the cost of corporate long-term borrowing," Commerce is complying with the Proposed Regulations' direction that a country-specific rate be utilized where a company-specific rate is unavailable. Accordingly, the Court rejects [Inland's] challenges and finds Commerce's use of Crédit National's equipment loan rates as the benchmark interest rate in evaluating whether the FDES loans consolidated in 1990 were countervailable is supported by substantial evidence on the record and is otherwise in accordance with law.

*Inland Steel,* 967 F.Supp. at 1356–58.

### B. Computation of the Duty Rate: The "Sales Denominator" Issue

■ Once Commerce decides which events are countervailable, its next task is to compute a countervailing duty rate. In determining this rate, Commerce divides the amount of the subsidy by the amount of sales of products assisted by that subsidy. This case presents the issue as to whether the sales denominator should correspond to Usinor's domestic (French) sales or its total (international) sales. The

result turns on whether the subsidies at issue were "tied" to domestic production or were to be treated as fungible and thus likely to benefit Usinor's international production.

To assist in the resolution of this issue, Commerce adopted a rebuttable presumption that a governmental subsidy is tied to domestic production. Commerce explained its reasons for the adoption of the presumption, and clarified its operation, as follows:

> On the basis of our past administrative experience, we believe that it is reasonable to presume that the government of a country normally provides subsidies for the general purpose of promoting the economic and social health of that country and its people, and for the specific purposes of supporting, assisting or encouraging domestic manufacturing or production and related activities (including, for example, social policy activities such as the employment of its people). Conversely, that same government would not normally be motivated to promote, at what would be considerable cost to its own taxpayers, manufacturing or production or higher employment in foreign countries.

> Thus, under the Department's ["tying"] analysis, the Department will begin by presuming that a subsidy provided by the government of the country under investigation is tied to domestic production. However, this presumption is not irrebuttable. A party may rebut this presumption by presenting evidence tending to show that the subsidy was not tied to domestic production. Relevant evidence may include the nature of the program at issue, whether the subsidy was bestowed specifically to provide other than a domestic benefit, communications between the government and the respondent relating to the subsidy provided pursuant to the program at issue, the government's ownership interest, if any, in the respondent, and any other evidence addressing the likely beneficiaries of the subsidy. Such determinations would have to be made on a case-

> by-case basis, in light of the facts presented. Therefore, the above list of evidentiary criteria is not exhaustive, nor can any one or several of these factors necessarily give decisive guidance in all cases.

> The Department will allocate the benefit of the subsidy in accordance with the determination that we make on tying. If we determine that the subsidy is tied to domestic production, we will allocate the benefit of the subsidy fully to sales of domestically produced merchandise. If we determine that the subsidy is not tied, we will allocate the benefit of the subsidy to total worldwide sales of the respondent, i.e., sales of both domestically produced merchandise and foreign-produced merchandise.

*Final Determination I* at 37231. Commerce thereafter found that the presumption had not been rebutted by Usinor. *See id.* at 37236. On appeal to the Court of International Trade, the court found that Usinor had been denied due process, and ordered Commerce to "give interested parties notice and the opportunity to comment on the agency's adoption of the tying presumption," and "the opportunity to present evidence on the record for the purpose of rebutting the tying presumption." *British Steel I*, 879 F.Supp. at 1319. Commerce, after receiving further evidence and comment, continued its use of the presumption and continued to find the presumption unrebutted. *See Final Results of Redetermination Pursuant to Court Remand on General Issue of Sales Denominator,* Consol. Ct. No. 93–00550–CVD (Dept. Comm. June 23, 1995). On appeal for the second time, the Court of International Trade affirmed Commerce's use of the tying presumption and its conclusion that Usinor did not rebut the presumption that the various subsidies it had received were tied to its domestic production. *See British Steel II*, 929 F.Supp. at 439–57.

We note that the Court of International Trade's resolution of the sales denominator issue in *British Steel II* conflicts with its

resolution in *Usinor Sacilor v. United States (Usinor )*,[5] a case that has been separately appealed to this court and was heard concurrently with the present appeal. *See Usinor Sacilor v. United States,* No. 98–1268, 98–1269, 98–1286, 1999 WL 641231 (C.A.Fed. June 17, 1998). *Usinor* involved a record which the parties have represented is identical to the present appeal, except that the investigation which led to that case involved different types of steel products; otherwise the years in investigation, the subsidies, and the record evidence are the same as described herein. However, in *Usinor,* a different judge of the Court of International Trade found that Commerce's conclusion that the subsidies at issue were tied to domestic production was not supported by substantial evidence and ordered Commerce to adjust the sales denominator to include Usinor's international sales. *See Usinor Sacilor v. United States,* 966 F.Supp. 1242, 1243–44 (Ct. Int'l Trade 1997) (*Usinor III* ).

Both Usinor and Inland appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (1994).

## DISCUSSION

■ In reviewing a decision of the Court of International Trade, this court applies anew the statutory standard of review applied by that court to the agency's decision. *PPG Indus., Inc. v. United States,* 978 F.2d 1232, 1236 (Fed.Cir.1992). Therefore, we must affirm the court's decision unless we conclude that the agency's determination was not supported by substantial evidence or was otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b) (1994).

### A. *Fact–Based Issues on Appeal*

■ Both parties appeal a significant number of factual determinations made by

Commerce. Usinor appeals Commerce's characterization of the PACS and FIS instruments as debt upon issuance. Inland cross-appeals four factual determinations, including (1) Commerce's characterization of the Crédit National loans to Usinor as not "specific," (2) Commerce's use of "equipment loan rate" as reasonable under the circumstances, (3) Commerce's determination that the FDES loans were not countervailable, and (4) Commerce's characterization of the shareholder advances as grants upon issuance.

■ We affirm all of these determinations. As we have already noted, we, like the Court of International Trade, review Commerce's factual determinations for substantial evidence. This is a limited standard of review that only tests whether a determination is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). This standard of review does not allow us to substitute our judgment for that of Commerce, *see Akzo N.V. v. United States Int'l Trade Comm'n,* 808 F.2d 1471, 1487 (Fed.Cir.1986), nor does it allow the parties to retry factual issues before us de novo, *see Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1548 (Fed.Cir.1994).

In this case, the court, employing the same standard of review, clearly showed that each of the foregoing factual determinations of Commerce was supported by substantial evidence. This evidence includes (1) the PACS instruments' clear repayment obligation and guaranteed interest payments, (2) the FIS instruments' fixed payment schedule, (3) verified information showing that the Crédit National loans were not specifically provided to Usinor, (4) evidence that the OECD Monthly

---

5. Because the Court of International Trade in *Usinor* remanded that case to Commerce three times, its decision on the denominator issue is contained in its four opinions on the subject. *See Usinor Sacilor v. United States,* 893 F.Supp. 1112 (Ct. Int'l Trade 1995) (*Usinor I* ); *Usinor Sacilor v. United States,* 955

F.Supp. 1481 (Ct. Int'l Trade 1997) (*Usinor II* ); *Usinor Sacilor v. United States,* 966 F.Supp. 1242 (Ct. Int'l Trade 1997) (*Usinor III* ); *Usinor Sacilor v. United States,* 991 F.Supp. 665 (Ct. Int'l Trade 1997) (*Usinor IV* ).

Financial Statistics for Crédit National equipment loans was the highest long-term interest rate commonly available to firms in the country, (5) evidence that the Crédit National equipment loan rate reflected the cost of corporate long-term borrowing, and (6) the lack of evidence that the French government's grant did not evidence any expectation of repayment or the retention of any other monetary rights. Accordingly, we affirm the decision of the court with respect to these determinations by Commerce.

### B. The Sales Denominator Issue

The remaining issue to be resolved is whether the denominator that is used to establish the countervailing duty rate should correspond to Usinor's domestic or total world-wide sales. In doing so, it is useful to clarify what issues are not in dispute and which we therefore need not resolve. All parties agree that Commerce properly employed a tying determination here, thereby effectively creating an exception to the general rule that money should be treated as fungible. Furthermore, all parties agree that Commerce acted correctly in performing its tying determination by assessing the *likely* effects of the subsidies at issue at the time of their bestowal. Concomitantly, all parties agree that Commerce need not trace the *actual* effects of the subsidy in making a tying determination.[6] Finally, no party argues that Commerce was powerless as a general matter to utilize a presumption to assist it in making the tying determination.

Instead, Usinor makes a two-pronged attack on Commerce's determination that the subsidies were tied to domestic production. Usinor first argues that Commerce erred as a matter of law in premising its presumption on the concept of governmental intent. In support of that view, Usinor points to the legislative history of the countervailing duty laws to show that evidence of economic effects is the only proper basis upon which Commerce's presumption of domestic tying can be founded. Usinor next argues that Commerce's· determination that the subsidies were tied to domestic production is not supported by substantial evidence.

■■■■ We disagree with both arguments. As for Usinor's·first argument, we find it difficult to reconcile with Usinor's admission that Commerce need not consider evidence of the actual effects of a subsidy when performing a tying determination. Actual effects are the best evidence of economic effects. In any event, as Usinor admits, there is no statute governing precisely how Commerce is to allocate the effect of a subsidy to a company's production. In the absence of a specific congressional mandate, Commerce's reasonable interpretation controls. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly by Congress." (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974))); *see also NLRB v. Baptist Hosp., Inc.,* 442 U.S. 773, 787, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979) (noting that "courts have the duty to review [agency] presumptions both 'for consistency with the Act, and for rationality.'" (quoting *Beth Israel Hosp. v. NLRB,* 437 U.S. 483, 501, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978))); *United Scenic Artists, Local 829 v. NLRB,* 762 F.2d 1027, 1034 (D.C.Cir.1985) ("Presumptions may, of course, be established both by legislative bodies and by administrative agencies, but their validity depends as a general rule upon a rational nexus between the proven facts and the presumed facts."). That

---

**6.** *Cf. Saarstahl AG v. United States,* 78 F.3d 1539, 1543 (Fed.Cir.1996) ("Congress has expressed the ... view that an 'effects' test for subsidies has never been mandated by the law and is inconsistent with effective enforcement of the countervailing duty law. It would be burdensome and unproductive for ... Commerce to attempt to trace the use and effect of a subsidy demonstrated to have been provided to producers of the subject merchandise.").

Commerce has created a presumption that subsidies are tied to domestic production on the premise that a foreign government normally intends to principally benefit its domestic production is eminently reasonable. As Commerce explained, countries usually disburse subsidies with the intent of benefiting their domestic economies. We as a court of review may not simply substitute a different judgment that we might consider preferable. *See Saarstahl AG v. United States,* 78 F.3d 1539, 1542 (Fed.Cir.1996) ("The duty of the reviewing court 'is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute.'" (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 665 (Fed.Cir.1992))). Moreover, we do not see how Usinor's citation of the legislative history of the countervailing duty laws helps its position. That history merely mandates that Commerce establish "[r]easonable methods of allocating the value of ... subsidies over the production or exportation of products benefiting from the subsidy." *See* S.Rep. No. 96–249, at 85 (1979). As we have already indicated, Commerce's use of the presumption is reasonable.

██ We also disagree with Usinor that Commerce's determination that the subsidies that Usinor received were tied to domestic production was not supported by substantial evidence. The record supports Commerce's conclusion that the French Government's primary intent in restructuring Usinor's debt as well as that of other French steel producers was to benefit the French domestic steel industry and accordingly that these entities were the likely beneficiaries of the bestowed subsidies. In a statement of policy concerning its restructuring plans, the French government stated that "the whole undertaking is to make the French steel industry internationally competitive and to get it back into shape so that it can then develop normally using normal resources." Joint App. at 3472; *see also* Press Release of President

Francois Mitterand, June 9, 1982 (noting that one intent of the restructuring plan was to "supply an export flow" of products) ("Press Release"). The French government also stressed the "social" nature of its plans, the intent of which could only logically pertain to the promotion of French social policy. *See* Joint App. at 3472; *see also* Press Release (expressing concern that the restructuring plans do not lead to "mass lay-offs without re-assignment"). The French Government also made representations to the National Assembly that the objective of the restructuring was to "make the French Steel Industry among the most competitive ... in the world." *Id.* at 1194. A reasonable fact-finder could conclude that these statements meant that the purpose of the subsidies was to support the steel industry in France. Moreover, the French Government's ownership interest in Usinor suggests that its intent to subsidize domestic industry would be realized, *see id.* at 1369–85, and the government even went so far as to specify plans for the modernization of certain French production facilities. *See id.* at 1376–78. None of these plans suggests that the French Government intended to directly subsidize the foreign operations of Usinor or any other company.

Usinor does not dispute the import of this evidence, but contends that Commerce overlooked evidence that it alleges shows that the likely beneficiaries of the French Government's subsidies were the domestic *and* international operations of the affected steel producers. This evidence takes the form of three "case studies" in which Usinor funneled funds to various international subsidiaries. But this evidence is vague at best. It merely shows that Usinor distributed funds to its international subsidiaries, an activity to be expected in any multinational corporation. This is not evidence showing which entities were the likely beneficiaries of the subsidies.

Even if we were to draw the inference that Usinor would have us draw from the evidence it cites, we would still conclude

**1362**

that the record evidence that we have summarized is substantial and thus supports Commerce's determination. Simply put, a reasonable mind could accept this evidence to support the conclusion that the French domestic steel industries were the likely beneficiaries of the bestowed subsidies and therefore that these subsidies were tied to French domestic production, notwithstanding any purported evidence to the contrary. Evidence of a contrary intent does not destroy the substantiality of the evidence that the French Government intended to benefit the domestic industry through its subsidies.

We have considered the parties' remaining arguments but find them without merit.

### CONCLUSION

The Court of International Trade did not err in affirming Commerce's use, when computing the countervailing duty rate, of a presumption that governmental subsidies are "tied" to domestic production. The court furthermore did not err in concluding that substantial evidence supported Commerce's conclusion that the presumption had not been successfully rebutted by Usinor. Finally, the court did not err in affirming various other factual determinations of Commerce, as these determinations were supported by substantial evidence. Accordingly, the decision of the Court of International Trade is

*AFFIRMED.*