SLIP OP.  00-66

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

ALLEGHENY LUDLUM CORP., et al.,   :

                     :

        **Plaintiffs,**   :

                     :      **Before:  WALLACH, Judge**

      **v.**           :      **Court No.:  99-06-00362**

                     :

UNITED STATES,       :

                     :      **PUBLIC VERSION**

        **Defendant,**   :

                     :

      **and**          :

                     :

ALZ N.V.,          :

                     :

      **Defendant-Intervenor.**   :

_____:

[Plaintiffs' Rule 56.2 Motion For Judgment Upon The Agency Record granted in part and denied in part.]

                                  Decided:  June 7, 2000

Collier, Shannon, Rill & Scott, PLLC (David A. Hartquist, Paul C. Rosenthal, Kathleen W. Cannon, R. Alan Luberda, Lynn Duffy Maloney, and John M. Herrmann), for Plaintiffs.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; U.S. Department of Justice, Civil Division, Commercial Litigation Branch (Michele D. Lynch); Myles S. Getlan, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

**OPINION**

**I**

**INTRODUCTION**

This case comes before the Court on Plaintiffs' Rule 56.2 Motion For Judgment Upon The Agency Record ("Plaintiffs' Motion"), challenging the decision of the International Trade Administration of the U.S. Department of Commerce ("Commerce" or "the Department") in Final Affirmative Countervailing Duty Determination; Stainless Steel Plate in Coils from Belgium, 64 Fed. Reg. 15567 (1999) ("Final Determination"). Plaintiffs dispute Commerce's finding in this investigation that certain programs or transactions did not confer countervailable subsidies upon a Belgian producer of stainless steel coiled plate, and question whether the Department accurately measured the subsidies that it found had been conferred.

Counsel have presented well-briefed and ably argued claims concerning the various points in dispute. Upon consideration of these arguments, the Court finds that a remand is necessary so that Commerce may (a) evaluate whether it erred in not investigating the Government of Belgium's ("GOB") 1984 purchase of stock in the Belgian steel company Siderurgie Maritime SA ("Sidmar"), and (b) consider record evidence which appears to undermine its conclusion that no subsidy was conferred though the GOB's participation in a joint venture with Sidmar. In all other respects, the Final Determination is affirmed.

## II

## BACKGROUND

On March 31, 1998, Plaintiffs filed a countervailing duty petition with Commerce alleging that a Belgian producer of stainless steel plate in coils, ALZ N.V. ("ALZ"), had benefitted from numerous types of subsidies provided by the GOB, the regional Government of Flanders ("GOF") and the European Commission ("EC"). See Initiation of Countervailing Duty Investigations: Stainless Steel Plate in Coils from Belgium, Italy, the Republic of Korea, and the Republic of South Africa, 63 Fed. Reg. 23272 (1998) ("Initiation Notice"). Based upon this information, on April 28, 1998, Commerce initiated a countervailing duty investigation concerning the subject merchandise, identifying fourteen programs operated by the GOB and the GOF, and five programs operated by the EC, that potentially provided countervailable subsidies[1] to the Belgian stainless steel coiled plate industry. Id. at 23273. Besides subsidies that were allegedly provided directly to ALZ, Commerce also investigated whether certain subsidies provided to Sidmar should be attributed to ALZ, on account of Sidmar's ownership interests in ALZ. See id.

On August 28, 1999, Commerce issued its Preliminary Determination[2] and, after conducting

---

[1] Although Commerce listed only fourteen "programs" as subject to investigation, some of these numbered programs were no than general headings covering multiple potential subsidies. See, e.g., Initiation Notice, 63 Fed. Reg. at 23273 (listing seven potential countervailable programs, such as "Grants and Interest Rebates" and "Accelerated Depreciation" under heading number eight, entitled "*Benefits pursuant to the Economic Expansion Law of 1970*").

[2] Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination: Stainless Steel Plate in Coils From Belgium, 63 Fed. Reg. 47239, 47245 (1998) ("Preliminary Determination").

verification and considering the parties' case and rebuttal briefs, issued its <u>Final Determination</u> on March 31, 1999. <u>See</u> <u>Final Determination</u>, 64 Fed. Reg. at 15584 (finding the countervailable subsidy rate for ALZ to be 1.82 percent, <u>ad valorem</u>). Four aspects of this determination are relevant to Plaintiffs' challenge and are discussed in the respective sections below.

## III

## ANALYSIS

## A

## STANDARD OF REVIEW

In reviewing Commerce's determination, the Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." <u>Ceramica Regiomontana, S.A. v. United States</u>, 10 CIT 399, 404-5, 636 F. Supp. 961, 966 (1986), <u>aff'd</u>, 810 F.2d 1137 (Fed. Cir. 1987). "Substantial evidence is something more than a 'mere scintilla,'" and must be enough evidence to reasonably support the Department's conclusion. <u>Id.</u> at 405, 636 F. Supp. at 966.

**B**

## REMAND IS NECESSARY SO THAT COMMERCE MAY EITHER RECONSIDER OR ELABORATE UPON ITS DECISION NOT TO INVESTIGATE THE GOB'S 1984 EQUITY INFUSION INTO SIDMAR.

Plaintiffs' first claim challenges Commerce's decision not to investigate the GOB's 1984 purchase of Sidmar's common and preferred shares (characterized by Plaintiffs as an "equity infusion").

In their initial petition to the Department, Plaintiffs alleged that five GOB programs provided subsidies specifically to ALZ, and that another three programs provided Sidmar subsidies "that are [a]ttributable to ALZ." Plaintiffs' Countervailing Duty Petition of 03/31/98 at iii and 33-42. Plaintiffs did not identify the GOB's 1984 investments in Sidmar as a subsidy "[a]ttributable to ALZ," although they did reference these investments in a separate section of the petition entitled "Overview of the Belgian Industry Producing Stainless Steel Plate in Coils and the Subsidies Alleged." Id. at iii and 28. In the overview section, Plaintiffs stated that "[i]n 1984 the GOB increased its ownership in Sidmar through a combination of debt to equity conversions and direct equity infusions . . . ." Id. at 30. As support, Plaintiffs cited and attached excerpts from a 1988 book which briefly described these transactions and noted that "[t]he [European] Commission indicated that in its view the Belgian government had overvalued the shares acquired in Sidmar, but was 'prepared to consider that a higher price could be considered normal for the purchase of a blocking minority.'" Id. at Ex. B-8, p. 124. Apart from this one sentence statement, however, which was made in the course of a general discussion of the GOB's ownership interests in both ALZ and Sidmar, Plaintiffs petition did not address the 1984

equity infusion in Sidmar.[3]


Presumably because of this fact, Commerce did not list these investments as subject to investigation in its <u>Initiation Notice</u> of April 28, 1998. <u>See</u> <u>Initiation Notice</u>, 63 Fed. Reg. at 23273. Plaintiffs neither specifically challenged this action, nor commented on Commerce's failure to investigate these investments in the <u>Preliminary Determination</u>. Three days prior to the start of verification, however, Plaintiffs requested that Commerce examine the terms of the GOB's 1984 acquisition of Sidmar stock through a debt-to-equity conversion and verify the methodology used by the GOB to arrive at the value per share. <u>See</u> Letter from Petitioners to Commerce of 11/06/98 at 9-10. Plaintiffs followed up this request by arguing in their case brief, submitted following verification, that Commerce should countervail these transactions because the GOB failed to make an objective analysis of the commercial soundness of its investment in Sidmar. <u>See</u> Petitioners' Case Brief of 02/11/99 at 17-33; <u>Final Determination</u>, 64 Fed. Reg. at 15575.


In the <u>Final Determination</u>, Commerce declined to investigate these transactions, since it found that Plaintiffs "first made this allegation" after the regulatory deadline set out in 19 C.F.R. § 351.301(d)(4)(i)(A). <u>Final Determination</u>, 64 Fed. Reg. at 15575. In relevant part, 19 C.F.R. § 351.301(d)(4)(i) (2000)[4] provides that "[a] countervailable subsidy allegation made by the petitioner or

---

[3] In their response to questions posed by the Court, Plaintiffs note that Ex. B-19 to their petition of March 31, 1998, which contains a listing of state aid to the Belgian steel industry, also specifically identifies the purchase of Sidmar shares by the GOB. <u>See</u> Plaintiffs' Response To Question Posed In The Court's Order Dated March 14, 2000, at 4 (citing Ex. B-19 at 6). This portion of Ex. B-19 does not appear to have been cited in Plaintiffs' petition.

[4] The applicable regulations for this investigation were those in effect as of April, 1998. <u>See</u> <u>Final Determination</u>, 64 Fed. Reg. at 15567. Where there have been no subsequent changes to these

other domestic interested party is due no later than:  (A) [i]n a countervailing duty investigation, 40 days before the scheduled date of the preliminary determination."

Plaintiffs advance both factual and legal arguments why this decision was in error.  For the reasons stated below, the Court remands this issue to Commerce for further consideration.

## 1

## Commerce Did Not Mischaracterize Plaintiffs' Claim as a "New Subsidy Allegation."

Plaintiffs first argue that, rather than presenting a new subsidy allegation, their case brief "simply represented a legal theory about how to treat factual information already on the record."  Memorandum Of Law In Support Of Plaintiffs' Motion For Judgment On The Agency Record ("Plaintiffs' Memorandum") at 8.  Essentially, Plaintiffs claim that Commerce misconstrued record evidence in finding that the 1984 transactions were not already a part of the Department's investigation.

Pursuant to 19 U.S.C. § 1671a(b)(1) (1994) ("Petition requirements"), a proper subsidy allegation "alleges the elements necessary for the imposition of the duty imposed by section 1671(a) of [Title 19]."[5]  Section 1671(a) states that a countervailing duty shall be imposed if Commerce

regulations, the Court cites to their most recent codification. (i.e., the 2000 regulations).

[5]  19 C.F.R. § 351.202(b)(7)(ii)(B) (2000) implements this provision by requiring that a petition requesting the imposition of countervailing duties include, "to the extent reasonably available to the petitioner," information on:

The alleged countervailable subsidy and factual information (particularly documentary evidence) relevant to the alleged countervailable subsidy, including any law, regulation,

determines that a government is providing a "countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported . . . into the United States." 19 U.S.C. § 1671(a) (1994). A subsidy, in turn, is deemed to be conferred when a government authority "provides a financial contribution," including an equity infusion, "to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B) & (D) (1994). "Government provision of equity does not per se confer a countervailable benefit," however. Comeau Seafoods Ltd. v. United States, 13 CIT 923, 935, 724 F. Supp. 1407, 1417 (1989). Rather, 19 U.S.C. § 1677(5)(E) (1994) provides that, "in the case of an equity infusion," a benefit is generally conferred "if the investment decision is inconsistent with the usual investment practice of private investors."

In light of these requirements, it is clear that Plaintiffs did not properly allege, until submission of their case brief, that the 1984 investments in Sidmar constituted countervailable subsidies that should be investigated. Although Plaintiffs' initial petition noted that "[i]n 1984 the GOB increased its ownership in Sidmar through a combination of debt to equity conversions and direct equity infusions," Plaintiffs' Countervailing Duty Petition of 03/31/98 at 30, this general statement was made only in the "overview" section of their petition. Plaintiffs did not list these investments with the other alleged subsidies that it specifically requested to be investigated. Nor did Plaintiffs allege the elements necessary for the imposition countervailing duties, since their petition failed to indicate that any "benefit" was conferred

---

or decree under which it is provided, the manner in which it is paid, and the value of the subsidy to exporters or producers of the subject merchandise.

See also 19 U.S.C. § 1671a(c)(1)(A) (1994) (providing that, within 20 days after a petition is filed, Commerce shall "determine whether the petition alleges the elements necessary for the imposition of a duty under section 1671(a) of [Title 19] and contains information reasonably available to the petitioner supporting the allegations").

through the GOB's equity investments.

Notwithstanding this initial shortcoming, Plaintiffs advance multiple arguments for why their case brief did not advance a "new allegation." First, Plaintiffs note that the 1984 infusion was just one in a series of related steel restructuring subsidies that was already being investigated by Commerce. This fact, Plaintiffs argue, "illustrates the error in the agency's characterization of the 1984 transaction as a 'new subsidy allegation.'" Plaintiffs' Memorandum at 10.

While Plaintiffs appear correct in noting the similarity of the Sidmar investments to other financial contributions that were under investigation (namely, the GOB's 1985 equity investments in ALZ), this fact does not excuse Plaintiffs' earlier failure to identify these transactions in an enumerated claim. Although made pursuant to the same general GOB plans for aiding the steel industry, the GOB's purchase of Sidmar common and preferred stock involved different transactions and separate companies than the GOB's investments in ALZ. Moreover, because 19 U.S.C. § 1677(5)(E) (1994) provides that a benefit will normally be conferred through an equity infusion when "the investment decision is inconsistent with the usual investment practice of private investors," different financial contributions made pursuant to the same general program may lead to opposing countervailability determinations.[6] Cf. Nation Ford Chem. Co. v. United States, 21 CIT 1371, 1377, 985 F. Supp.

---

[6] In recognition of this legal standard, Commerce separately investigated each financial contribution under the GOB's Claes and Gandois plans to determine "whether the GOB investment was inconsistent with the usual investment practice of private investors in Belgium." Final Determination, 64 Fed. Reg. at 15569. In so doing, Commerce requested specific information concerning each of the GOB's 1985 equity infusions to ALZ. See Dep't of Commerce Countervailing Duty Questionnaire at 2-3 (seeking information on the conversion of BF 1,161 billion in state-guaranteed debt to equity and the purchase of additional ALZ shares for BF 1,400 billion). Commerce then analyzed the GOB's purchase of ALZ's "preference shares" in 1985 separately from its investigation of the GOB's purchase

133, 138 (1997) (recognizing that even subsidy determinations involving a previously reviewed

program are "fact-specific" and subject to changed circumstances), aff'd, 166 F.3d 1373 (Fed. Cir.

1999).  Such factors illustrate the uniqueness of the Sidmar transactions and reasonably support

Commerce's decision to treat Plaintiffs' claims concerning them as distinct from those subsidy claims

already under investigation.


        Plaintiffs' second claim is that Commerce wrongly considered Plaintiffs' argument to be a new

allegation because all the factual information relevant to the 1984 equity transaction was on the record.

See Plaintiffs' Memorandum at 11-12.  While this evidence may raise questions about whether

Commerce had timely "discovered" this alleged subsidy (as discussed below), the mere fact that

information about the transaction had been put into the record says nothing about whether the GOB's

purchases of Sidmar's stock constituted a distinct transaction.  Nor does such evidence demonstrate

that Plaintiffs "allege[d] the elements necessary for the imposition of [a countervailing] duty," as required

by 19 U.S.C. § 1671a(b)(1) (1994), within the time limits laid down in 19 C.F.R. §

351.301(d)(4)(i)(A) (2000).  Thus, even if true, this argument provides no basis for disturbing

Commerce's characterization of the facts before it.[7]

---

of ALZ's "common shares" in that year, and concluded in both instances that the equity infusions did not
constitute contervailable subsidies.  See Final Determination, 64 Fed. Reg. at 15569-70.

        [7]  Plaintiffs further appear to argue that, because this record evidence was sufficient to make a
subsidy determination, Commerce erred in finding this evidence inadequate.  See Plaintiffs'
Memorandum at 12.  ("Thus, to the extent the agency's consideration of a new allegation turns on
whether the record evidence is sufficient to make a determination regarding a program's
countervailability, the 1984 equity infusion did not constitute a 'new allegation' given the abundance of
record evidence concerning this subsidy.").  As noted above, in the Final Determination Commerce
rejected Plaintiffs' allegation because it was untimely -- not because the record evidence supporting it
was inadequate.  To the extent Plaintiffs attack a rationale that was not advanced by Commerce in the

Finally, the Court also rejects Plaintiffs' argument that the 1984 equity infusion did not constitute a new subsidy allegation because "it clearly occurred within the time period being examined by Commerce." Plaintiffs' Memorandum at 10 n.4. The time period examined by Customs corresponds to the time period over which the Department must allocate non-recurring subsidies (i.e., the average useful life ("AUL") of a firm's assets) when determining a subsidy rate for the period of investigation (in this case, 1997). See 19 C.F.R. § 351.524(b) (2000) (codifying the Department's practice of allocating non-recurring benefits). It is unrelated and irrelevant to whether a party has made an adequate and timely subsidy allegation. To find otherwise would make Commerce's regulations concerning timely allegations meaningless, since, under Plaintiffs' argument, any subsidy conferred in the decade or two prior to the period of investigation would automatically be alleged (regardless of whether a respondent actually alleged the subsidy).[8] See, e.g., Final Determination, 64 Fed. Reg. at 15568 (noting the AUL for ALZ and Sidmar's assets as 15 and 19 years, respectively).

In short, the Court finds that substantial record evidence supports Commerce's conclusion that Plaintiffs' case brief raised a "new allegation" with respect to the Sidmar share transactions, in violation of the time limits of 19 C.F.R. § 351.301(d)(4)(i)(A) (2000). Plaintiffs have identified no grounds for disturbing this finding.

---

Final Determination, the Court will not consider their argument. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

[8] The issue of whether a petitioner made a timely subsidy allegation, however, is independent from whether Commerce has an independent obligation to investigate subsidies discovered during an investigation. See infra, Section III.B.3 (remanding for Commerce to consider whether it had a legal obligation to investigate the 1984 acquisition of Sidmar stock).

**2**

**Remand Is Necessary So That Commerce May Either Conform its Decision Not
to Accept Plaintiffs' New Subsidy Allegation with its Prior Decision to Investigate
Untimely Allegations, or Explain its Apparently Inconsistent Actions.**

In addition to challenging Commerce's characterization of the facts, Plaintiffs allege that Commerce's rejection of its claim is inconsistent with its earlier decision to examine Plaintiffs' untimely allegations concerning the GOB's 1987 and 1993 sales of ALZ stock to Sidmar.  See Plaintiffs' Memorandum at 13.  Such inconsistency, Plaintiffs argue, is directly contrary to this Court's holdings that Commerce must either conform its actions to its prior decisions or explain the reasons for its departure.  Id. at 13 & n.10.

"Although Commerce is traditionally granted broad discretion in its selection of methodology to implement the [antidumping and countervailing duty statutes], Commerce may not abuse its discretion and its choice of methodology may not be arbitrary."  Hussey Copper, Ltd. v. United States, 17 CIT 993, 997, 834 F. Supp. 413, 418-19 (1993).  Rather, "an agency must either conform itself to its prior decisions or explain the reasons for its departure."  Id. at 997, 834 F. Supp. at 418.  This rule against creating conflicting precedents "is not designed to restrict an agency's consideration of the facts from one case to the next, but rather it is to insure consistency in an agency's administration of a statute."  Id. Accordingly, it is well-established that Commerce may depart from a prior practice so long as it provides a "'reasoned analysis'" for its change.  See Rust v. Sullivan, 500 U.S. 173, 187;[9] Motor

---

[9]  As explained by the Supreme Court:

[T]he agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.  An agency is not required to

Vehicle Mfgs. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29,

42 (1983); accord Mantex, Inc. v. United States, 17 CIT 1385, 1399, 841 F. Supp. 1290, 1302-03

(1993).

In its brief, Defendant attempts to address the Department's apparent inconsistency by

distinguishing the late allegations Commerce did choose to investigate. Specifically, Defendant states

that

> although plaintiffs filed their submission describing these additional share transactions
> after the regulatory deadline, the filing took place prior to the preliminary determination
> and verification of questionnaire responses. Consequently, there was time for
> Commerce to solicit additional information and to verify such information with respect
> to these transactions. Additionally, ALZ did not argue that plaintiffs' submission
> describing these additional share transactions constituted an untimely filed subsidy
> allegation. See Def.'s Exh. 2, Pub. Doc. 72. Indeed, in Final Affirmative
> Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from
> France, 64 Fed. Reg. 30774, 30787 (June 8, 1999), Commerce exercised its
> discretion to address a subsidy allegation filed after the deadline because the
> respondents did not express an objection to the petitioners' allegation with respect to its
> possible untimeliness.

Memorandum Of The United States In Opposition To Plaintiffs' Motion For Judgment Upon The

Administrative Record ("Defendant's Response") at 17.

This explanation might sufficiently distinguish the two situations, since Plaintiffs' case brief

---

> establish rules of conduct to last forever, but rather must be given ample latitude to
> adapt its rules and policies to the demands of changing circumstances.

Rust, 500 U.S. at 186-87 (citations and internal quotations omitted).

discussing the GOB's 1984 Sidmar investments was submitted after verification and had drawn a

protest from the respondents. See Final Determination, 64 Fed. Reg. at 15575 (noting ALZ's

untimeliness argument); see also American Farm Lines v. Black Ball Freight Service, 397 U.S. 532,

539 (1970) ("'[I]t is always the discretion of . . . an administrative agency to relax or modify its

procedural rules adopted for the orderly transaction of business before it when in a given case the ends

of justice require it. The action of [an agency] in such a case is not reviewable except upon a showing

of substantial prejudice to the complaining party.'") (quoting NLRB v. Grace Co., 184 F.2d 763, 764

(8th Cir. 1953)). The Government's problem, however, lies in the fact that this explanation was made

only by the Department of Justice in the course of this litigation, and not by the Department of

Commerce in its countervailing duty investigation. See Burlington Truck Lines, Inc. v. United States,

371 U.S. 156, 168-69 (1962) ("The courts may not accept . . . counsel's post hoc rationalizations for

agency action;  . . . an agency's discretionary order [must] be upheld, if at all, on the same basis

articulated in the order by the agency itself.").


A review of the Final Determination, the Preliminary Determination, and the other papers in this

case fails to show any similar explanation by Commerce of why it chose to investigate some untimely

allegations, but not others. Rather, the record simply shows that in one instance Commerce used its

discretion to consider untimely allegations, while in a later instance it decided not to do so. Compare

Final Determination, 64 Fed. Reg. at 15575 ("[W]e have not conducted an investigation of the Sidmar

share transactions because the petitioners did not meet this regulatory deadline."), with Memorandum of

08/28/98 from Team to Richard Moreland ("Concurrence Memorandum; Summary of Issues") at 5-6

(investigating the 1987 and 1993 sale by the GOB of its shares in ALZ to Sidmar, despite the

observation that petitioners asked Commerce to investigate these transactions "[o]nly in the more recent

submissions made after the deadline for filing new allegations"). Such inconsistency by Commerce is inappropriate, absent an adequate explanation.

Accordingly, this aspect of the <u>Final Determination</u> is remanded with instructions that Commerce either conform its decision not to accept Plaintiffs' new subsidy allegation with its prior decision to investigate untimely allegations, or explain on the record the reasons for this apparent inconsistency. To ensure consistency with other investigations, Commerce is also instructed to explain how its decision on remand comports with other instances where it has used its discretion to similarly reject or accept untimely allegations.[10]

**3**

**Remand Is Necessary For Commerce to Consider Whether it Had
a Legal Obligation to Investigate the 1984 Equity Infusion in Sidmar.**

As an alternative to their arguments above, Plaintiffs assert that, even if their case brief did make a "new allegation," Commerce was required by statute to consider the Sidmar share transaction in the <u>Final Determination</u>. According to Plaintiffs, 19 U.S.C. § 1677d and its implementing regulation, as well as 19 U.S.C. § 1677m(e), impose on Commerce an obligation to consider subsidies discovered during an investigation. Commerce violated these mandates, Plaintiffs claim, by ignoring reliable record

---

[10] Such instances include, but are not limited to, <u>Final Negative Countervailing Duty Determination; Certain Granite Products From Italy</u>, 53 Fed. Reg. 27197, 27205 (1988) (declining to investigate an uncreditworthiness allegation made "two days before our departure for verification" where " [n]ot only the verification, but the entire investigation must be structured to accommodate [the] analysis"); <u>Final Negative Countervailing Duty Determination: Silicon Metal From Brazil</u>, 56 Fed. Reg. 26988, 26993 (1991) ("Because the Department collected the information on this alleged benefit (i.e., the tax form) during verification, petitioners were justified in attempting to bring this alleged benefit to the attention of the Department. Therefore, petitioners' claim is not untimely.").

data evidencing this subsidy.  See Plaintiffs' Memorandum at 16-17 ("Commerce was in possession of

all the verified information necessary to perform its statutory analysis and thus had no justification for

failing to consider plaintiffs' arguments.").

In relevant part, 19 U.S.C. § 1677d (1994) provides as follows:

> If, in the course of a proceeding under this subtitle, the administering authority discovers
> a practice which appears to be a countervailable subsidy, but was not included in the
> matters alleged in a countervailing duty petition . . . then the administering authority--
>    (1) shall include the practice, subsidy, or subsidy program in the proceeding if the
> practice, subsidy, or subsidy program appears to be a countervailable subsidy with
> respect to the merchandise which is the subject of the proceeding . . . .

In turn, 19 C.F.R. § 351.311 (2000) ("Countervailable subsidy practice discovered during investigation

or review") states in relevant part:

>    (b) *Inclusion in proceeding*.  If during a countervailing duty investigation or a
> countervailing duty administrative review the Secretary discovers a practice that
> appears to provide a countervailable subsidy with respect to the subject merchandise
> and the practice was not alleged or examined in the proceeding . . . the Secretary will
> examine the practice, subsidy, or subsidy program if the Secretary concludes that
> sufficient time remains before the scheduled date for the final determination or final
> results of review.
>    (c) *Deferral of examination*.  If the Secretary concludes that insufficient time
> remains before the scheduled date for the final determination or final results of review to
> examine the practice, subsidy, or subsidy program described in paragraph (b) of this
> section, the Secretary will:
>    (1) During an investigation, allow the petitioner to withdraw the petition without
> prejudice and resubmit it with an allegation with regard to the newly discovered
> practice, subsidy, or subsidy program;  or
>    (2) During an investigation or review, defer consideration of the newly discovered
> practice, subsidy, or subsidy program until a subsequent administrative review, if any.
>    (d) *Notice*.  The Secretary will notify the parties to the proceeding of any practice the
> Secretary discovers . . . .

Based upon the plain meaning of this statute and regulation, it is clear that Commerce has an affirmative

duty to investigate subsidies discovered during the course of an investigation, even if (for practical

reasons) the investigation of the newly discovered subsidies must wait for an administrative review.[11]

While not challenging the validity of this obligation, the Government asserts that these provisions

are not relevant, since "Commerce did not indicate that it had discovered a 1984 equity infusion in

Sidmar during the proceeding." Defendant's Response at 15. According to Defendant, "[t]he absence

of any such finding renders the statutory and regulatory provisions described above inapplicable." Id. at

15-16.

This argument is unpersuasive. While it may be true that Commerce "did not indicate" that it

had discovered the 1984 equity infusion in Sidmar, this explanation says nothing about whether

---

[11]  It is not clear, however, how Plaintiffs' citation to 19 U.S.C. § 1677m(e) (1994) supports
their argument. Section 1677m(e), entitled "[u]se of certain information," is a limitation on Commerce's
power to disregard a party's deficient responses to information requests, in favor of facts available
under 19 U.S.C. § 1677e(a) (1994). See Borden, Inc. v. United States, 4 F. Supp.2d 1221, 1246
(CIT 1998) ("[U]nder subsection (e), even if the initial information submitted is 'deficient', and even if,
after an opportunity to 'remedy or explain,' the Department finds that information 'not satisfactory,' it still
must use the information, rather than facts available, so long as the criteria of subsection (e) have been
met."); accord Mannesmannrohren-Werke AG v. United States, 77 F. Supp.2d 1302, 1313 (CIT
1999).

Here, there is no indication that Commerce specifically requested information from ALZ
concerning the 1984 equity infusion in Sidmar or found the information it had received inadequate.
This, of course, is not surprising, since Commerce was not investigating this transaction. See Final
Affirmative Countervailing Duty Determination: Stainless Steel Plate In Coils From Italy, 64 Fed. Reg.
15508, 15517-18 (1999) ("[B]ecause the use of the Brite-EuRam program had not been alleged or
discovered in time to solicit adequate information from all of the necessary respondents, we have no
basis upon which to use facts available with respect to this program. Accordingly, we are not making a
determination on the countervailability of the Brite-EuRam program in this proceeding."). Thus, Plaintiff
has failed to show § 1677m(e) is applicable to this case.

Commerce actually discovered this transaction, should have discovered this transaction, or had this

potential subsidy brought to its attention.[12]  Here, Plaintiffs have identified record evidence collected by

Commerce during its investigation which indicates the existence of a countervailable subsidy.

Specifically, Plaintiffs point to ALZ's questionnaire response, as well as their own case brief, as

evidence not only of the equity infusion, but also the terms of the transaction and the benchmark share

price needed to measure the benefit bestowed.  See Plaintiffs' Memorandum at 11.  Such evidence, on

its face, appears to trigger Commerce's investigatory obligations under the plain language of 19 U.S.C.

§ 1677d and 19 C.F.R. § 351.311.


Despite the seeming relevance of this information, in the Final Determination Commerce did not

---

[12]  Commerce does not have an unfettered right to decide whether it has discovered a potential subsidy.  Such a power would contradict the affirmative obligation of 19 U.S.C. § 1677d (1994), since it would give Commerce the ability to ignore even manifest evidence of a subsidy that was placed before it by one of the parties.  Such a power would also conflict with Congress' intention in adding this provision to the Tariff Act of 1930, which was to avoid  "unnecessary separate" investigations and "increase[d] expenses and burdens" by "includ[ing] such practices within the scope of any current investigation, or make them a part of the library of subsidy practices so that persons in the future may know of them when deciding whether to petition for an investigation."  Sen. Rep. No. 96-249, at 98 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 484.

The Court is aware that Commerce's § 1677d obligation may allow a petitioner who failed to make a timely subsidy allegation under 19 C.F.R. § 351.301(d)(4)(i)(A) (2000) to "cure" its mistake by simply presenting evidence of a countervailable subsidy to Commerce before its final determination. Congress, however, clearly intended that all potentially countervailable programs be investigated and catalogued, regardless of when evidence on these programs became reasonably available.

Of course, a petitioner who does not timely make a subsidy allegation, even though it could, risks having Commerce defer its investigation to a subsequent administrative review.  See 19 C.F.R. § 351.311(c)(2) (2000) (allowing Commerce to "defer consideration of the newly discovered practice, subsidy, or subsidy program until a subsequent administrative review" if Commerce "concludes that insufficient time remains before the scheduled date for the final determination.").  Thus, it is always in a petitioner's interest to expeditiously make Commere aware of potential subsidies.

address this evidence.[13] Although Commerce found that Plaintiffs had untimely advanced their allegations concerning the 1984 equity infusion, Final Determination at 15575, the Department said nothing concerning its own, independent obligation to investigate potential subsidies discovered during the investigation. Failing such explanation, the Court is left only to conclude that Commerce committed legal error by simply overlooking or ignoring this record evidence.

Accordingly, this aspect of the Final Determination is also remanded for further consideration by Commerce. On remand, Commerce is instructed to examine the record evidence concerning the 1984 equity infusion in Sidmar that it collected (or was put before it) during this investigation and, in light of 19 U.S.C. § 1677d (1994) and 19 C.F.R. § 351.311 (2000), discuss whether it had an obligation to investigate this transaction as a potential subsidy for the Final Determination. Should it find

---

[13] In its Response, Defendant states that

The information relied upon by plaintiffs certainly does not provide a complete factual basis for investigating, not to mention countervailing, benefits associated with a 1984 equity infusion in Sidmar. Of course, if this information was sufficient to provide a basis for investigating a 1984 equity infusion, there is no reason why petitioners could not have filed a timely subsidy allegation considering that such information was filed in June 1998.

Defendant's Response at 16.

This argument is problematic in two respects. First, while Defendant correctly notes that Plaintiffs should have made a timely subsidy allegation if all the facts were reasonably available, this point is irrelevant to whether Commerce had an obligation to investigate this transaction. Nothing in the plain language of 19 U.S.C. § 1677d (1994) suggests that Commerce is relieved of its obligation if a petitioner could have made a timely allegation, but failed to do so.

Second, there is no finding by Commerce that the information Plaintiffs cite provides an insufficient factual basis for investigating the 1984 equity infusion in Sidmar. Thus, counsel's observation concerning this evidence can only be viewed as a post hoc rationalization, which this Court may not consider.

in the affirmative, Commerce is instructed to reopen its investigation, determine whether this transaction

constitutes a countervailable subsidy, and (to the extent it does) adjust ALZ's net countervailable

subsidy rate accordingly.

**C**

### COMMERCE DID NOT ERR IN ITS ANALYSIS OF SNCI
### LOANS TO THE BELGIAN STEEL INDUSTRY.

Plaintiffs' next claim challenges Commerce's finding that loans made to the Belgian steel industry

by the Societe Nationale de Credite a l'Industrie ("SNCI")[14] were not "specific" to that industry.

Before Commerce may countervail a subsidy, 19 U.S.C. § 1677(5)(A) (1994) requires the

Department to find that the subsidy is "specific" to an enterprise or industry.[15]  "Specificity" may be

---

[14]   SNCI was a public credit institution which, until 1997, was fifty percent owned by the Belgian Government.  Final Determination, 64 Fed. Reg. at 15570.  Through medium and long-term financing, SNCI "encouraged the development and growth of industrial and commercial enterprises in Belgium."  Id.

[15]   A principal purpose of this requirement is to differentiate between those subsidies that distort trade by aiding a specific company or industry, and those that benefit society generally (like the police, fire protection, roads and schools) and thus minimally distort trade, if at all.  See John Jackson, The World Trading System:  Law and Policy of International Economic Relations at 296-97 (2nd ed. 1998).  As Professor Jackson has observed, "[t]he basic idea [behind specificity] is that when there is a foreign government subsidy that affects exports, in order for the importing country to respond with countervailing duties it must be established that the subsidy is 'specific' and not one that is so 'generally available' that everyone in the exporting society can use it.  Id. at 296; see also Statement of Administrative Action ("SAA") Accompanying the Uruguay Round Agreements Act ("URAA"), H.R. Doc. No. 103-316, at 913 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4230 ("Consistent with longstanding U.S. practice, government assistance that is both generally available and widely and evenly distributed throughout the jurisdiction of the subsidizing authority is not an actionable subsidy.").

established in several ways, one of which is a showing that a particular industry received a

disproportionate share of the total subsidies provided under a program.  See 19 U.S.C. §

1677(5A)(D)(iii)(III) (1994) (providing that a subsidy is specific "as a matter of fact" if "[a]n enterprise

or industry receives a disproportionately large amount of the subsidy").[16]

In its Final Determination, Commerce concluded that loans made to the Belgian steel industry

by SNCI between 1987 and 1990 were not specific (and, thus, not countervailable) because the steel

industry did not receive a disproportionate share of SNCI's loans.  Final Determination, 64 Fed. Reg.

at 15570-71, 15577.  Plaintiffs allege that Commerce erred in two ways in making this determination:

first, by improperly departing from its former methodology for determining specificity; and second, by

improperly accounting for SNCI loans made to the Belgian steel industry through indirect channels.

---

[16]  This statute implements U.S. international obligations as established, inter alia, in Article 2 of
the 1994 Uruguay Round Agreement on Subsidies and Countervailing Measures.  See SAA at 929,
reprinted in 1994 U.S.C.C.A.N. at 4241 ("Section 771(5A) [of the URAA] implements the provisions
of Article 2 of the Subsidies Agreement dealing with specificity.").  As noted in the SAA, with respect
to the Agreement's requirements for specificity:

> Notwithstanding the absence of *de jure* grounds for a finding of specificity, where there
> are reasons to believe that the subsidy may in fact be specific, other factors may be
> considered.  They are:  (1) the use of a subsidy program by a limited number of certain
> enterprises; (2) the predominant use by certain enterprises; (3) the grant of
> disproportionately large amounts to certain enterprises; and (4) the manner in which
> discretion has been exercised by the granting authority in the decision to grant a
> subsidy.  In considering these four factors, the investigating authority is to take account
> of the diversification of economic activities within the relevant jurisdiction, as well as the
> length of time that a subsidy program has been in operation.  Article 2.4 [of the
> Uruguay Round Agreement on Subsidies and Countervailing Measures] requires that
> any determination of specificity be clearly substantiated on the basis of positive
> evidence.

Id. at 913-14, reprinted in 1994 U.S.C.C.A.N. at 4230.

Each of these points is discussed below.


**1**

**Commerce Reasonably Explained Why it Applied a Different Methodology
to Determine Whether SNCI Loans to the Steel Industry Were "Specific."**


The first error alleged by Plaintiff is that Commerce, without proper explanation, improperly used a different methodology in the Final Determination for determining specificity than that used in both the Preliminary Determination and a previous investigation involving the same alleged subsidy from SNCI, Final Affirmative Countervailing Duty Determination: Certain Steel Products From Belgium, 58 Fed. Reg. 37273 (1993) ("Certain Steel").


In Certain Steel, Commerce determined whether the Belgian steel industry had received a disproportionate share of all SNCI loans by comparing SNCI's loans outstanding to the steel industry with SNCI's loans outstanding to all other borrowers. Final Determination, 64 Fed. Reg. at 15570 (citing Certain Steel, 58 Fed. Reg. at 37280-81). In so doing, Commerce found that the Belgian steel industry had received a disproportionate share of SNCI's loans before 1987, but not during 1987 and 1988. Id.


In the Preliminary Determination in this case, Commerce applied this methodology to data on outstanding SNCI investment loans in 1989 and 1990, and preliminarily concluded that "loans approved between 1987 and 1990 . . . were non-specific and, therefore, not countervailable." Id. In the Final Determination, however, Commerce -- though coming to the same result -- applied a different methodology. Commerce explained:

In a change from the analysis used in *Certain Steel* and the *Preliminary Determination*, we have focused our analysis on the steel industry's share of <u>loans approved</u> in a given year rather than that industry's share of <u>loans outstanding</u> in a given year. We believe the former provides a better indication of whether loans are limited to specific industries. Loans outstanding can be affected by other factors besides the approval process which are not relevant to a specificity determination, such as the terms of loans. Therefore, for the final determination, we are modifying our analysis to examine the percentage of loans approved for the basic metals industry in each year. On this basis, we determine that the steel industry did not receive a disproportionate share of SNCI loans for the years 1987 through 1990.

<u>Id.</u> (emphasis added).


As noted previously, while Commerce is granted broad discretion in its administration of the antidumping and countervailing duty laws, its exercise of this discretion may not be arbitrary. Rather, Commerce "must either conform itself to its prior decisions or explain the reasons for its departure." <u>Hussey Copper</u>, 17 CIT at 997, 834 F. Supp. at 418; <u>see also</u> <u>Rust</u>, 500 U.S. at 187 (requiring a "reasoned analysis").


In this case, Commerce's explanation, though short, was adequate. Here, Commerce's undisputed goal was to determine whether the Belgian steel industry received disproportionately favorable treatment from SNCI during each of the years under review. It was thus perfectly reasonable for Commerce to focus on a methodology (loans approved) that is directly related to SNCI's actions during the relevant period of time, in lieu of its previous methodology (loans outstanding) that was susceptible to distortion from factors unrelated to SNCI's actions <u>during</u> that period.[17] While

---

[17] In fact, this approach is supported by the underlying facts here. Although in 1984 the steel industry directly received a disproportionate share (36.69 %) of all SNCI loans granted, its share of new loans decreased significantly thereafter (ranging from 2 % in 1990 to a high of 7.77 % of new

Commerce certainly could have provided a longer statement or more examples to support its new approach, the inherent logic of examining SNCI's _actual_ loan practices during the year under review -- as opposed to data which only reflects SNCI's _prior_ loan practices -- speaks for itself.

While Commerce's explanation alone is sufficient, the Department's approach is further supported by the emergence of new evidence for the _Final Determination_. In _Certain Steel_, the respondent argued that Commerce should consider the percentage of new loans opened or granted (rather than total loans outstanding) by industrial sector, in each year, to make its specificity determination. _Certain Steel_, 58 Fed. Reg. at 37290. Commerce responded to this proposal not by rejecting it, but by stating that such an analysis was not possible, since "the GOB did not provide data which would allow us to look at year-by-year shares or new loans issued as opposed to amounts outstanding." _Id._ Similarly, in the _Preliminary Determination_, Commerce again examined only data on SNCI loans outstanding, since this was the only relevant data before the agency. _See Preliminary Determination_, 63 Fed. Reg. at 47245 (stating that for SNCI loans made before 1989 "[n]o new information has been presented in this investigation to change our Certain Steel determination" and that "[t]he GOB provided information on the sectoral distribution of loans under the program for the years 1989 and 1990").

---

loans in 1986, not including loans made through coordination centers). Memorandum of 03/19/99 from Team to Richard Moreland regarding the specificity of SNCI Loans at p. 4 ("SNCI Memorandum"). Despite this significant decrease, the large size of the 1984 loan caused the percentage of SNCI's loans outstanding to the steel industry to remain significantly higher than the corresponding numbers for new SNCI loans to this industry from 1985-1990. For example, in 1985 new metal loans made directly to the Belgian steel industry constituted only 3.87 % of loans granted, while metal loans outstanding constituted 17.7 %. _Id._ Even by 1990, when the steel industry took only 2 % of SNCI's new loans, metal loans outstanding still accounted for 8.4 % of loans outstanding. _Id._ As Commerce concluded in examining this data, "the percentages of loans outstanding in each year after 1984 are a result of the large volume of loans granted to steel in 1984 and not from loans granted thereafter." _Id._

For the <u>Final Determination</u>, however, Commerce had, for the first time, information on SNCI's loans approved during a given year. In response to this information, Commerce stated in its Memorandum on this subject that

> [i]n *Certain Steel*, we used the figures for "total loans outstanding," because we did not have information to conduct a year-by-year analysis of loans approved. (*Certain Steel* at 37290) In the present case, we have information on loans approved for every year between 1984-1990. Therefore, we are including this data in our analysis.

SNCI Memorandum at 3.

Commerce's decision to examine SNCI loans approved in the <u>Final Determination</u> can not be considered arbitrary in light of this reasoned explanation. <u>See</u> <u>Rust</u>, 500 U.S. at 187. The Department's SNCI Memorandum, which is cited in the <u>Final Determination</u>,[18] makes clear that its decision to examine loans approved in the <u>Final Determination</u> -- as opposed to loans outstanding in <u>Certain Steel</u> and the <u>Preliminary Determination</u> -- was the result of examining the best evidence before it in each circumstance. In the <u>Final Determination</u>, Commerce had before it new and better evidence than it had previously, and it decided to use this data. Not only is such a result reasonable, but it raises the question of whether Commerce's use of this data should even be characterized as a "change" in its methodology (as opposed to the application of the same methodology to different data).

In short, Commerce provided reasonable explanations for why it did not rely on SNCI's loans outstanding in the <u>Final Determination</u>. This aspect of the <u>Final Determination</u> is therefore affirmed.

---

[18] 64 Fed. Reg. at 15570.

**2**

### Commerce Did Not Err in Evaluating SNCI Loans
### Made Through Coordination Centers.

Besides challenging Commerce's explanation for its new methodology, Plaintiffs argue that the

Department erred in evaluating certain SNCI loans that were made indirectly to the Belgian steel

industry.

In their case brief to Commerce, Plaintiffs argued that the data relied on by Commerce in

Certain Steel and the Preliminary Determination understated the Belgian steel industry's share of SNCI

loans, since this data did not account for SNCI loans made through "coordination centers."  Petitioners'

Case Brief of 02/11/99 at 34-37.  Among other activities, coordination centers provide companies with

financial services, such as "loan and equity financing and hedging of foreign exchange."  SNCI

Memorandum at 2.

Agreeing with Plaintiffs, for the Final Determination Commerce considered such indirect loans

in its specificity determination.  Final Determination, 64 Fed. Reg. at 15577.  Commerce, however,

was unable to obtain specific information on these loans, and was forced to make an approximation

based on limited evidence.  See SNCI Memorandum at 3.[19]  Specifically, Commerce found that SNCI

reported in its 1990 Annual Report that when loans made through coordination centers are accounted

---

[19]  Commerce found that "SNCI was unable to provide specific information on the share of loans to the banking and finance sector that went to coordination centers for each year.  Nor was it able to report the amount of loans granted specifically to the steel industry through coordination centers."  SNCI Memorandum at 3.

for, "the percentage of loans outstanding which went to the production and preliminary processing of metals industry (which includes steel) increases from 8.4 percent to 10.7 percent" Id. Using this data on loans outstanding, Commerce estimated the percentage of loans approved for the steel industry through coordination centers in the years through 1990. To do this, the Department took the percentage of SNCI's loans outstanding to steel coordination centers in 1990 (2.3 %), divided it by the percentage of outstanding SNCI's loans to the banking and finance industry (through which SNCI accounted for coordination center loans), and determined that steel coordination centers comprised 8.01 % of SNCI's loans to the banking and finance industry. Id. at 4 and Attachment 1. Commerce "then applied this percentage to the banking and finance industry's share of total loans granted for each year" to

arrive at revised, estimated figures. Id. at 4 (emphasis added).[20] Based on these new numbers, Commerce then analyzed whether the steel industry had received a disproportionate share of SNCI loans, and determined that loans provided by SNCI from 1987 to 1990 were not specific to that industry. Final Determination, 64 Fed. Reg. at 15571.

Plaintiffs challenge this methodology by arguing that, despite having rejected SNCI's figures for loans outstanding, Commerce then (improperly) relied on these figures in its calculations. According to

---

[20] Expressed as a formula:

$$\frac{\% \text{ of loans outstanding to steel coordination centers 1990 (2.3\%)}}{\% \text{ of loans outstanding to banking and finance industry 1990 (28.7 \%)}} = .0801 \ \ x \ \begin{array}{c} \textit{Percentage of banking \&} \\ \textit{finance loans granted during} \\ \textit{each year under review} \end{array} = \begin{array}{l} \textit{estimated \%} \\ \textit{of loans granted} \\ \textit{to steel industry} \\ \textit{through coord.} \\ \textit{centers} \end{array}$$

Plaintiffs:

> despite concluding that "{l}oans outstanding can be affected by other factors . . . which
> are not relevant to a specificity determination," Final Determination, 64 Fed. Reg. at
> 15,570, Commerce relied on a change in the percentage of outstanding loans held by
> the steel industry to estimate the percentage of loans granted to the steel industry in
> 1990. In so doing, the agency embraced the very approach it rejected in switching to a
> different specificity methodology in the final determination. Based on this inherent
> contradiction, Commerce's specificity determination should be remanded with
> instructions to calculate either a measurement of all SNCI loans granted to the steel
> industry, including those loans provided through coordination centers, based on record
> data concerning loans granted, or, if data is not available, to calculate the percentage of
> all outstanding SNCI loans held by the steel industry.

Plaintiffs' Memorandum at 22.

Plaintiffs further argue that "Commerce's methodology compounds this error by extrapolating the figure for 1990 to every year between 1984 and 1990," since "[t]he record is devoid of any evidence that supports the agency's wholesale application of its 1990 calculations." Id. at 23. As support, Plaintiffs observe that "not only does the agency explicitly state that the record contains no information on the percentage of all outstanding SNCI loans held by the steel industry for years other than 1990," but "the record contains evidence demonstrating that a higher percentage of coordination center loans were made to the industrial sector in 1989 than in 1990, presumably indicating that the percentage of outstanding loans held by the steel industry in 1989 was higher than the 2.3 percent figure used for 1990." Id.

a

<u>There is Nothing "Inherently Contradictory" about Commerce's Use of</u>
<u>SNCI's 1990 Data on Steel Loans Outstanding to Coordination Centers.</u>

As noted above, substantial evidence supports Commerce's decision to use data on SNCI's

loans granted, rather than loans outstanding, for determining specificity in the <u>Final Determination</u>.  In

applying its new methodology, the Department did not "reject" record evidence concerning loans

outstanding.  The record shows that Commerce used data on loans granted because (a) it was better

evidence, and (b) this evidence was available to it for the first time.  Commerce did <u>not</u> indicate that

evidence of loans outstanding was unreliable, or that such evidence should not be used.  On the

contrary, the record of this case, as well as Plaintiffs' own arguments, show that "data reflecting the

amount of loans outstanding is useful in the absence of evidence regarding the amount of loans

approved."  Defendant's Response at 24.

The Court does not agree that it was an "inherent contradiction" for Commerce to use the 1990

information on loans outstanding.  Here, Commerce used this information as an alternative means of

measuring specificity, since specific information concerning loans granted to the steel industry through

coordination centers was not available.  It did not use <u>rejected</u> or manifestly incorrect data.  Moreover,

Commerce did not simply rely upon the SNCI data concerning loans outstanding in 1990; it <u>used this</u>

<u>figure to make an estimate of SNCI's loans approved through coordination centers (for the steel</u>

<u>industry) for each year between 1984 and 1990</u>.  <u>See</u> SNCI Memorandum at 4.  Such an approach is

perfectly consistent with Commerce's stated preference for "examin[ing] the percentage of loans

approved for the basic metals industry in each year," <u>Final Determination</u>, 64 Fed. Reg. at 15570, and,

absent a specific showing of error by Defendant, is a reasonable means of accounting for indirect loans

made through coordination centers. Thus, there is nothing <u>inherently</u> wrong with Commerce's use of these figures.

b

<u>Commerce's Methodology Did Not Fail to Appreciate the Difference Between<br>Loans Granted and Loans Outstanding to Coordination Centers.</u>

Turning from the general to the specific, the Court also does not agree that Commerce, in using SNCI's 1990 data on steel loans outstanding to coordination centers, "wrongly equated loans granted with loans outstanding." Plaintiffs' Reply [21] at 8. Plaintiffs argue that Commerce erred in wrongly equating loans granted to loans outstanding for 1990 by <u>adding</u> the coordination centers' share of loans outstanding in 1990 (2.3%) to the percentage of loans granted to the steel industry in 1990. <u>Id.</u> This was incorrect, Plaintiffs argue, because the percentage of loans granted to coordination centers in 1990 was significantly greater than the coordination center's share of loans outstanding in that year. Plaintiffs argue that, "[b]y failing to account for the discrepancy between loans <u>granted</u> to coordination centers versus loans <u>outstanding</u>, Commerce's methodology thus artificially reduces the amount of loans granted to the steel industry by assuming that the coordination centers' share for loans outstanding in 1990 is a fair approximation of loans granted to coordination centers in that year." <u>Id.</u> at 9-10 (emphasis in original).

Plaintiffs' argument is based on a misunderstanding of how Commerce used the 1990 data. As their briefs make clear, Plaintiffs presume that Commerce simply added the percentage of outstanding

---

[21] Reply Brief In Support Of Plaintiffs' Motion For Judgment On The Agency Record ("Plaintiffs' Reply").

SNCI loans to steel coordination centers in 1990 (2.3 %) to SNCI's reported figures for either loans

outstanding or loans granted to the Belgium steel industry for the years 1987-90.[22]  This is incorrect.

As shown above, Commerce used the 2.3 % figure for loans outstanding to calculate the percentage

(8.01 %) of SNCI's loans outstanding to the banking and finance industry that went to steel

coordination centers in 1990.  See SNCI Memorandum at 4.  From there, Commerce applied this

percentage to the banking and finance industry's share of total loans granted for each year to

approximate figures for steel loans granted.  Id.  In 1990, for example, Commerce used 8.01 % as an

approximation for the percentage of banking and finance loans that went to steel coordination centers,

multiplied this figure by 45.6 % (representing SNCI loans granted to banking and finance), and

estimated that 3.65 % of all SNCI loans granted went to steel coordination centers.  Id.[23]  Similarly,

Commerce multiplied this 8.01 % figure by the percentage of SNCI loans granted to banking and

finance to calculate loans granted to steel coordination centers for each of the years at issue.  Id.

   In light of this evidence, it is clear that Commerce did not, as Plaintiffs claim, ignore record

evidence "[b]y failing to account for the discrepancy between loans granted to coordination centers

---

[22]  See id. at 8 ("Commerce then added that percentage (i.e., 2.3 percent) to the percentage of loans granted to the steel industry in 1990."); id. at 11 ("These figures suggest that the percentage of loans held by the steel industry in 1989 was higher than the 2.3 percent figure used for 1990."); Plaintiffs' Memorandum at 23 ("Accordingly, the record contains no support for (and even contradicts) the agency's extrapolation of the data concerning the percentage of all outstanding SNCI loans held by the steel industry in 1990 to the years between 1984 and 1989.").

[23]  Commerce then added this figure (3.65 %) to the corresponding figure for SNCI loans granted directly to the steel industry (2 %), to conclude that 5.65 % of SNCI loans made went either directly or indirectly to the steel industry.  SNCI Memorandum at 4.  On this basis, Commerce concluded that SNCI loans were not specific in 1990.  See Final Determination, 64 Fed. Reg. at 15570-71.

versus loans <u>outstanding</u>." Plaintiffs' Reply at 9. By using record evidence on banking and finance loans granted to approximate steel loans granted through coordination centers, Commerce accounted for the fact that "a greater share of loans was <u>granted</u> to coordination centers during the period in question." Plaintiffs' Reply at 9 (emphasis in original). Commerce did not, in using SNCI's 1990 figure on steel loans outstanding, treat loans granted and loans outstanding as comparable. Rather, it simply used this figure to approximate the percentage of loans <u>granted</u> to "banking and finance" during the years at issue that actually went to steel coordination centers. As such, Commerce's analysis neither ignores nor contradicts record evidence.

c

<u>Commerce Did Not Erroneously Extrapolate 1990 Data on Outstanding Loans<br>Held by the Belgian Steel Industry in Analyzing Loans Granted to That Industry.</u>

Finally, the Court rejects Plaintiffs' contention that record evidence contradicts the Department's decision to use the 1990 loan figure in deriving loan information for other years. <u>See</u> Plaintiffs' Memorandum at 23-24. According to Plaintiffs, Commerce's extrapolation of this data to the years prior to 1990 is unsupported by substantial evidence, since the percentage of SNCI loans granted through coordination centers in 1989 that went to companies in the industrial sector (90 %) is greater than the corresponding percentage of SNCI loans that went through coordination centers to such companies in 1990 (74 %). Plaintiffs' Reply at 11. This evidence, Plaintiffs say, "demonstrat[es] that a higher percentage of coordination center loans were [sic] made to the <u>industrial sector</u> in 1989 than in 1990." Plaintiffs' Memorandum at 23 (emphasis added). Thus, they conclude, "Commerce's decision to derive the loan figures for prior years based on the lending patterns for 1990 contradicts the record evidence, making this aspect of its SNCI specificity methodology unsupported by the record."

Plaintiffs' Reply at 11.

Plaintiffs' argument fails on three counts. First, Plaintiffs' argument presumes that because a higher percentage of coordination center loans was made to the <u>industrial sector</u> in 1989 than in 1990, a higher percentage of coordination center loans was also made to the Belgian <u>steel industry</u> in 1989. Plaintiffs identify no reason or evidence <u>why</u> this would be true, but simply assume that the two figures moved in tandem. Absent evidence, Plaintiffs' assumption is unproved.

Second, Plaintiffs' argument does not undermine the methodology chosen by Commerce. For the <u>Final Determination</u>, Commerce compared steel loans outstanding to total banking and finance loans outstanding in 1990 to derive a figure (8.01 %) by which it could estimate the percentage of steel loans granted through coordination centers for the years at issue. <u>See</u> SNCI Memorandum at 4. While the resulting figures may not be entirely accurate, they constitute reasonable estimates <u>derived from actual record evidence</u> of outstanding SNCI loans to steel coordination centers in 1990. In contrast, correlating coordination center loans made to the <u>industrial sector</u> in 1989 with such loans made to the Belgian <u>steel industry</u> in 1989 seems, absent evidence to the contrary, a clumsy means of estimating an increase in the latter. In the <u>Final Determination</u>, Commerce appears to have recognized as much, stating that "[i]nstead of employing the petitioners' suggestion to include all coordination center loans to industrial sectors and adding 10 percentage points to the calculation of loans provided to the steel industry, <u>we are accounting for coordination centers by using the information specific to the steel industry</u>." <u>Final Determination</u>, 64 Fed. Reg. at 15577 (emphasis added).

Third, Plaintiffs' argument is challenged by record evidence showing that coordination centers

played a less important role in 1989 than in 1990. <u>See</u> SNCI Memorandum at 3-4 ("[W]e also saw no indication that loans through the coordination centers had a greater impact in the years prior to 1990. Instead, the [SNCI] annual reports for those years indicate that the banking and finance sector, and specifically coordination centers, played a less significant role in the years prior to 1990."). In 1989, banking and finance (though which coordination center loans are accounted for in SNCI's annual reports) constituted only 40.6 percent of all SNCI's loans <u>granted</u>, compared to 45.6 percent for 1990. SNCI Memorandum at 4. Thus, even if coordination center loans to the steel industry were actually higher as a relative percentage of all SNCI <u>banking and finance loans</u> in 1989 than in 1990, they would not necessarily have constituted a higher percentage of SNCI's <u>total loans</u> in 1989. Of course, it is the steel industry's percentage of total loans that matters in determining whether SNCI's loans were "specific." <u>See</u> <u>Final Determination</u>, 64 Fed. Reg. at 15570 ("[F]or the final determination, we are modifying our analysis to examine <u>the percentage of [SNCI's] loans approved</u> for the basic metals industry in each year.") (emphasis added).

For the foregoing reasons, Plaintiffs have not shown that Commerce's methodology for approximating SNCI loans granted to steel coordination centers for the years up to, and including, 1990 is unsupported by substantial record evidence. The Court accordingly upholds this aspect of the <u>Final Determination</u>.

**D**

## COMMERCE'S CALCULATION OF SIDMAR'S SALES DENOMINATOR
## IS NOT CONTRARY TO LAW OR RECORD EVIDENCE.

Plaintiffs' third claim challenges the manner in which Commerce allocated subsidies provided to the Sidmar Group of companies ("Sidmar Group") in calculating a subsidy rate.

When Commerce finds an event countervailable, it determines the appropriate countervailing duty rate by "divid[ing] the amount of the subsidy by the amount of sales products assisted by that subsidy." Inland Steel Industries v. United States, 188 F.3d 1349, 1357 (Fed. Cir. 1999). [24] In line with this practice, Commerce determined the countervailing duty rate for the Sidmar Group by dividing the countervailable subsidies it discovered (the numerator) that were attributable to the period of investigation by the consolidated sales figures reported by ALZ's for the Sidmar Group's Belgian steel operations during the period of investigation (the denominator). See Final Determination, 64 Fed. Reg. at 15574; Defendant's Response at 26.

Providing Commerce with a sales "denominator," however, was not a straight-forward task. To derive a Belgium-only sales figure, ALZ took the revenues for the Sidmar Group's steel companies located in Belgium and subtracted cost account information on intra-company transfers. Reply Brief of ALZ, N.V. of 02/11/99 ("ALZ Case Brief") at 3; Final Determination, 64 Fed. Reg. at 15574. To do this, ALZ was required to add in, and then subtract out, sales revenue unrelated to any subsidies.

---

[24] Although no regulations implementing this methodology had been promulgated by the time of this investigation, Commerce's practice is currently implemented in 19 C.F.R. § 351.525 (2000) ("Calculation of ad valorem subsidy rate and attribution of subsidy to a product.").

Specifically, although the Sidmar Group derived total sales figures for its companies based on their accounts starting with the number "70," cost accounts covering intra-company transfers did not correspond exactly with the "70" accounts. Rather, "[w]hile cost accounts beginning with the number '60' (the '60 account') correspond mostly to 70 accounts, some of the items included therein correspond to 74 account items." ALZ Case Brief at 3 (emphasis added).[25] The Sidmar Group's "74 accounts" covered "Other Operating Income." Id. The other costs corresponding to revenue items recorded in the 74 accounts were recorded in accounts beginning with the number "61." Id.

Because of this lack of correspondence, to simply deduct the Sidmar Group's intra-group 60 account entries from its 70 account revenues would have understated the Sidmar Group's steel revenues by deducting costs unrelated to steel sales. See id. In turn, if used as the denominator to calculate a countervailing duty rate, this understated figure would have lead to a subsidy rate that was inappropriately high.[26] To avoid this problem and "achieve complete correspondence between revenues and expenditures," ALZ added the Group's 70 accounts (turnover) and its 74 account (other operating income), and then "deducted from that combined total the intra-group acquisitions reflected in accounts 60 and 61," to arrive at a consolidated sales figure. Final Determination, 64 Fed. Reg. at 15574.

---

[25] ALZ explained that "if one company records the revenue from the sale of a good in a 70 account, the purchasing company would record the cost of the purchase in a 60 account. However, if one company records the revenue in a 74 account, the purchasing company may record the cost in either a 60 account or a 61 account." ALZ Case Brief at 3.

[26] This would result because the amount of the subsidy, the numerator, would be divided by a smaller (understated) denominator.

In the Final Determination, Commerce approved of this approach, stating simply that "[a]s noted by respondents, simply deducting the 60 account results in an understatement of Sidmar's operating income. Thus, for purposes of our final determination, we have retained in Sidmar's sales denominator the revenue from account 74 because this is the most accurate information on the record." Id.

Plaintiffs challenge this aspect of the Final Determination on essentially two grounds, one substantive, one procedural. The Court finds neither argument persuasive.

**1**

**Commerce Did Not Err in Failing to Exclude Revenue
From the Sidmar Group's "74 Accounts."**

Plaintiffs first argue that Commerce erred in using the sales figures provided by ALZ, since this figure "included sales from a revenue account [the "74 accounts"] that bear no relation to Sidmar's production of the subject merchandise." Plaintiffs' Memorandum at 25. According to Plaintiffs, "[i]n accordance with Commerce practice . . . these sales should not have been reflected in SIDMAR's sales denominator . . . ." Id. at 26.

Essentially, Plaintiffs posit an argument that Commerce unjustifiably departed from its former practice for calculating countervailing duty rates. As noted previously, Commerce may depart from a practice used in prior antidumping and countervailing duty investigations so long as it provides a reasoned analysis for its change. See Rust, 500 U.S. at 187. Here, however, the Court need not evaluate the reasonableness of the Department's explanation, since Plaintiffs have failed to show that

Commerce actually departed from its former methodology.

Standing alone, Commerce's inclusion of a non-production-related source of revenue in the denominator would certainly be contrary to its practice. See, e.g., Inland Steel Industries v. United States, 21 CIT 553, 563, 967 F. Supp. 1338, 1351 (1997) ("[Commerce] calculates the per-unit subsidy rate by dividing the amount of the subsidy . . . by the appropriate portion of the subsidized firm's sales."), aff'd, 188 F.3d 1349 (Fed. Cir. 1999). As discussed above, however, this non-production-related revenue was effectively "removed" from the denominator by subtracting out the Sidmar Group's "60" and "61" cost accounts, leaving only a figure representing the Group's consolidated steel sales. See ALZ Case Brief at 3. The only reason for the inclusion of "74 account" revenues in the first place was to ensure that "costs" unrelated to the Sidmar Group's steel sales were not inappropriately included in the denominator. See Certain Iron-Metal Castings From India: Final Results of Countervailing Duty Administrative Review, 62 Fed. Reg. 32297, 32302 (1997) ("[I]t is imperative that both the numerator (the benefit) and denominator (the universe of sales to which the benefit applies) used in our calculation of a subsidy reflect the same universe of goods. Otherwise the rate calculated will either over- or understate the subsidy attributable to the subject merchandise.").

In its briefs, Plaintiffs argue only that Commerce improperly included "sales from a revenue account that bear no relation to Sidmar's production of the subject merchandise"; they do not discuss the fact that this "improper" revenue was subtracted from the denominator before Commerce ran its computations.[27] Because the resulting denominator used by Commerce appears to include only Sidmar

---

[27] For example, although Defendant's Response discusses the record evidence concerning why revenues from account 74 were included in the denominator, see Defendant's Response at 29 ("If

Group sales that benefitted from subsidies, and because Plaintiffs have provided nothing to rebut this appearance, the Court finds Commerce's denominator determination to be in accordance with law and supported by substantial record evidence.

**2**

**Commerce Was Not Required to Use Facts Otherwise Available
In Calculating a Sales Denominator for the Sidmar Group.**

Plaintiffs also challenge the sales denominator used by Commerce on procedural grounds. According to Plaintiffs, the record shows that Commerce "had asked ALZ to report Sidmar's sales data exclusive of non-production related sources of revenue on more than one occasion," but that ALZ repeatedly failed to provide it with this data. Plaintiffs' Reply at 15. As a result, Commerce was forced to rely on "a newly estimated sales figure" for consolidated sales submitted at verification, id., "which resulted in an inflated denominator and thus benefitted ALZ by incorrectly reducing the subsidy margin," Plaintiffs' Memorandum at 26. This reduced subsidy margin, Plaintiffs continue, "wrongly rewarded ALZ for its failure to cooperate," in violation of the policy objectives underlying the facts available rule. Id. at 27. Thus, they propose, "this issue should be remanded for Commerce to revise its denominator calculation with the facts available rule." Id.

---

Commerce had excluded certain revenue from this account [74] and had deducted all acquisition costs from accounts 60 and 61, Commerce would have derived an understated and inaccurate sales figure."), Plaintiffs' Reply simply ignores this argument. Rather, Plaintiffs' Reply deals entirely with the alleged "lateness" of ALZ's reported sales figure, and simply assumes – without proving – that Commerce's use of this figure is defective. See Plaintiffs' Reply at 14 ("Commerce fails to recognize that the defects in the reported sales figures were the fault of ALZ, and, thus, that the agency should have understated, rather than overstated, Sidmar's sales.").

28 U.S.C. § 2637(d) (1994) states that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies" for such a challenge. A review of the record does not show that Plaintiffs ever specifically argued before the Department that it should have resorted to "facts available" -- a fact acknowledge by both parties at oral argument. Rather, Plaintiffs appearance before this Court is the first time they argue that Commerce should employ "facts available," even though they had opportunities to present this argument earlier. Thus, without more, the Court must reject Plaintiffs' claim for failure to exhaust administrative remedies. See Delverde v. United States, 21 CIT 1294, 1301, 989 F. Supp. 218, 225 (1997) (dismissing a party's challenge to Commerce's calculation of a sales denominator where the party had not previously exhausted it administrative remedies), rev'd on other grounds, 202 F.3d 1360 (Fed. Cir. 2000).

At oral argument, Plaintiffs attempted to provide the Court with "something more" by clarifying that they are not seeking a punitive application of facts available on remand. Rather, Plaintiffs noted, their argument is simply that Commerce was unjustified in selecting an inaccurate figure which benefitted ALZ, given a choice between an understated or overstated sales denominator. See Plaintiffs' Reply at 15. Plaintiffs also agreed with the Court that this argument would be largely irrelevant if the Court did not find that Commerce's denominator calculation benefitted ALZ.

Regardless of whether this clarification saves Plaintiffs' argument from § 2637(d), it does not lead to a different substantive result. As noted above, Plaintiffs have failed to show that the denominator used by Commerce included Sidmar Group revenues that did not benefit from subsidies. Accordingly, even if ALZ failed to provide Belgium-only sales figures in an untimely manner, as Plaintiffs allege, there is no evidence that ALZ "benefitted" from its inaction. By Plaintiffs' own

admission, therefore, there is no need for the Court to address whether ALZ's presentation of sales figures to the Department was untimely or whether the application of facts available sought by Plaintiffs is, indeed, punitive.

In short, Plaintiffs have not shown that Commerce erred, either substantively or procedurally, in calculating a sales denominator figure for the Sidmar Group. The Court accordingly finds the Department's calculation of the Sidmar Group's sales denominator to have been in accordance with law and supported by substantial evidence.

**E**

**REMAND IS NECESSARY SO THAT COMMERCE MAY CONSIDER WHETHER SIDMAR BENEFITTED THROUGH ITS PARTICIPATION IN A JOINT VENTURE WITH THE GOVERNMENT OF FLANDERS.**

Plaintiffs' final claim concerns Commerce's decision not to countervail the regional Government of Flanders' participation in a joint venture with Sidmar.

In 1985, the GOB purchased both common and preferred stock in ALZ, pursuant to a royal decree which allowed the GOB to make share subscriptions in the Belgian steel industry. Commerce's Analysis Memorandum of ALZ Preference Shares of 03/19/99 at 1. According to the terms of the purchase, in 2005 the preferred shares are to be redeemed by ALZ at the higher of their subscription value (initial cost) or fair market value, or, at ALZ's option, converted to common shares. Id. at 2. Holders of preferred stock are entitled to a preferred dividend of six percent of the stock's face value,

to the extent profits for such a dividend are available. Id. These dividends are not mandatory or cumulative; at the time of investigation ALZ had not issued a common or preferred dividend since 1985, although the company had been profitable. Id.

In 1993, Sidmar expressed interest in buying this ALZ preferred stock from Gimvindus, a financial holding company for the GOF which had acquired the stock in 1989 through a government reorganization. Id.[28] At verification, Sidmar officials informed Commerce that 1993 was an unprofitable year for the Sidmar Group, and that it [was seeking to increase its consolidated holdings]. Id. [29] [The Government and Sidmar entered into a joint venture. The Government contributed its ALZ preference shares in exchange for shares in the joint venture]. Id. at 3. For its part, Sidmar contributed [shares and cash]. Id.

In the Preliminary Determination, Commerce determined that Sidmar had "acquired the [ALZ] preference shares . . . in return for an ownership interest in a Sidmar controlled company." Preliminary Determination, 63 Fed. Reg. at 47243. Commerce found that because "the GOB [    ] sold these

---

[28]  As Commerce explained in its memorandum concerning ALZ preference shares:

In 1989, Gimvindus acquired the preference shares as a result of the second constitutional reform of 1988, which transferred the responsibility for the national sector companies to the regions. To address this new responsibility, the regions established financial holding companies. Gimvindus was created in order to manage all of the Flemish national sector companies transferred from the federal government.

Id.

[29]  According to a private bank official Commerce met with at verification, Belgian banks place an emphasis on the value of a company's asset base in determining its creditworthiness. Id. at 2 n.1.

preference shares at a price below the market value for ALZ stock," the GOB had conferred a

countervailable subsidy to Sidmar.  Id.   For the Final Determination, however, Commerce reversed its

position and found that, as Sidmar had not actually acquired any interests in the ALZ preferred shares,

"no countervailable benefit was conferred upon Sidmar though the creation of the joint venture."  Final

Determination 64 Fed. Reg. at 15570.  Explaining this reversal, Commerce stated the following:

> the Department verified that this transaction was structured in such a way that the
> government maintained ownership of ALZ's preference shares.  Moreover, it was
> established at verification that Sidmar does not control the company.  Thus, Sidmar
> neither controls the ALZ preference shares contributed to this company nor can profit
> from the shares.  Accordingly, contrary to our *Preliminary Determination*, we
> determine that Sidmar did not "acquire" the preference shares originally purchased by
> the GOB.  Therefore, no countervailable benefit was conferred upon Sidmar through
> the creation of the joint venture by Sidmar and the GOB.

Id.

Plaintiffs challenge the Department's findings on various grounds, each of which is summarized

below.  For the following reasons, the Court finds that remand is necessary.

**1**

**Commerce Did Not Err in Concluding That Gimvindus
Maintained Ownership of the ALZ Shares.**

Plaintiffs first attack the Department's conclusions by arguing that "Commerce failed to

recognize that ALZ's preference shares derived their value from two sources:  (1) the market value of

the shares, and (2) dividends."  Plaintiffs' Memorandum at 28.  According to Plaintiffs, record evidence

shows that [the GOB's retained rights had no value]  Id.  As support for their claim, Plaintiffs cite, inter

alia, [record evidence that the Government never realized a return from the retained rights]. Id. at 29. This, according to Plaintiffs, illustrates that "the preference shares derived their value from the eventual repurchase or reconversion of the shares at the market value," which was "exactly what the GOB relinquished in the transaction." Id.

In order for Commerce to impose a countervailing duty on merchandise imported into the United States, it must determine that a government is "providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export" of that merchandise. 19 U.S.C. § 1671(a)(1) (1994). In relevant part, 19 U.S.C. § 1677(5)(B) (1994) provides that a subsidy exists when "an authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." (emphasis added).

As noted above, in the Final Determination Commerce based its finding that no benefit had actually been conferred to Sidmar on the fact that Sidmar (1) did not own or control the ALZ preference shares, (2) could not profit from these shares, and (3) did not control Sidfin. Final Determination, 64 Fed. Reg. at 15570. Plaintiffs essentially attack this conclusion by arguing that Sidmar did, in fact, receive a "benefit" through Gimvindus' transfer of the "market value" of its ALZ shares to the joint venture. A close review of the evidence cited by Plaintiffs, however, proves this claim unpersuasive.

To support their assertions that the ALZ preferred stock [had multiple rights, only some of which the Government retained in the transaction], Plaintiffs cite pages five and six of Commerce's verification report for Sidmar. Plaintiffs' Memorandum at 29. This document, however, does not

evidence such a distinction. While the report states that any dividends paid by ALZ [cannot profit Sidmar], Verification Report for Sidmar of 1/20/99 ("Sidmar Verification Report") at 6, it says nothing about whether Sidmar or Sidfin became entitled to the "market value" of the ALZ preferred shares. Rather, it simply provides a description of the creation of Sidfin which, if anything, implies that [the Government] retained <u>all</u> the rights associated with the ALZ stock. <u>See</u> <u>id.</u> at 6 [The joint venture consolidates Sidmar's holdings while retaining the Government's ownership of ALZ's preference shares] (emphasis added).[30]

Moreover, other evidence cited by Plaintiffs actually undermines their argument. In their effort to show that the "dividend rights" from the ALZ preferred stock had no value, Plaintiffs cite the Government of Flanders Verification Report as evidence that [the Government] "'viewed the dividend as insignificant and would rather focus on the eventual repurchase or reconversion of the preference shares in 2005.'" Plaintiffs' Memorandum at 29 (quoting Verification Report for the Government of

---

[30] Following oral argument, the Court allowed Plaintiffs to identify other record evidence to support its argument [concerning the ownership of ALZ's preference shares] and that [the Government's ownership rights were restricted]. Plaintiffs' Memorandum at 28-29. Plaintiffs accordingly identified two record documents -- (1) Sidmar Verification Exhibit 8(a) at 1-4, and (2) ALZ's Questionnaire Response of 06/19/98, at Exhibit D-1 at 3 -- which they claimed demonstrate that ALZ's preference shares derive their value from two sources, the market value and dividends. Plaintiffs' letter to the Court of 04/28/00.

The Court does not find that this evidence leads to a different conclusion. It generally discusses the valuation of ALZ shares, and does not indicate that Sidmar received any form of "market value" in the preferred ALZ stock. In fact, Exhibit D-1 to ALZ's Questionnaire Response (dated December 1984) predates the creation of Sidfin by approximately eight years, and could not have addressed this issue. At most, these documents constitute some evidence which could indicate that the ALZ preference shares have some value apart from the right to future dividends. Such evidence, however, fails to establish that Commerce acted unreasonably in concluding that "Sidmar did not 'acquire' the preference shares originally purchased by the GOB." <u>Final Determination</u> at 15570.

Flanders of 01/27/99 ("Flanders Verification Report") at 9). By showing that [the Government] was concerned with the repurchase or reconversion of the shares in 2005, however, this statement actually indicates that [the Government retained ownership] of the ALZ preferred stock after the creation of Sidfin. Presumably, had Sidmar become entitled to [profit from the shares, the Government] would have little or no interest in their redemption.[31]

In light of this evidence, the Court finds no basis for concluding that Gimvindus retained anything less than the complete right to all revenues that were to be derived from the ALZ preferred stock after the formation of Sidfin. Plaintiffs' argument therefore fails to disturb the Department's factual findings that a benefit had not been conferred.

---

[31] Other evidence in the Flanders Verification Report further confirms that [the Government retained ownership rights]. Flanders Verification Report at 11 (emphasis added). This official further noted his insistence that "the joint venture be accompanied by an agreement that [the Government] would continue to retain full value of its preference shares." Id. (emphasis added). Finally, this official added that it was "government policy . . . to maintain a stable participation in the steel industry" and "that selling its ownership interests in the steel sector is not an option for [the Government] at this time." Id.

All three statements are incompatible with the idea that Sidmir acquired any significant "value" or "interest" in the ALZ preference stocks owned by [the Government].

**2**

**Remand Is Necessary So That Commerce May Fully Consider Sidmar's
Statement That it Administers the Joint Venture Alone.**

a

<u>The Record Does Not Show That Commerce
Considered Sidmar's Financial Statement</u>.

Plaintiffs further challenge Commerce's factual findings by arguing that Commerce ignored three pieces of record evidence which show that Sidmar actually controlled the joint venture. First, Plaintiffs cite a remark in Sidmar's audited financial statement that Sidfin "is administered by our group only" as evidence that the ALZ preferred stock was actually controlled by Sidmar, contrary to the Department's findings. Plaintiffs' Memorandum at 32 (citing Sidmar's 1994 Financial Statement at 64). Upon review, the Court finds merit in this claim.

In reviewing Commerce's factual determinations under the substantial evidence standard, the agency is "presumed . . . to have considered all pertinent information sought to be brought to its attention." <u>Nakajima All Co. v. United States</u>, 14 CIT 469, 478, 744 F. Supp. 1168, 1175 (1990); <u>see also</u> <u>United States v. Chemical Foundation, Inc.</u>, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Moreover, there is no statutory requirement that the Department explicitly discuss every piece of record evidence that is put before it in an investigation. <u>Cf.</u> <u>Torrington Co. v. United States</u>, 16 CIT 220, 224, 790 F. Supp. 1161, 1167-68 (1992) ("The fact that certain information is not discussed in a[n International Trade]

Commission determination does not establish that the Commission failed to consider that information because there is no statutory requirement that the Commission must respond to each piece of evidence presented by the parties."), aff'd, 991 F.2d 809 (Fed. Cir. 1993) (unpublished disposition); Opie v. INS, 66 F.3d 737, 740 (5th Cir. 1995) (noting that the Board of Immigration Appeals "'need not write an exegesis on every contention'") (quoting Ghassan v. INS, 972 F.2d 631, 636 (5th Cir. 1992)).

That said, it is also well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence. See Usinor Sacilor v. United States, 21 CIT 37, 44, 955 F. Supp. 1481, 1488 (1997) ("The Court finds that it is unreasonable for Commerce to look only to the intent of the French government and its control over the state-owned firm when there is other economic evidence in the administrative record that Commerce easily could have considered."), aff'd in part and rev'd in part on other grounds, 1999 WL 641231 (Fed. Cir. Aug. 24, 1999) (unpublished disposition); Olympia Industrial, Inc. v. United States, 7 F. Supp.2d 997, 1002 (CIT 1998) ("Commerce's decision to reject the data without further investigation or explanation is not reasonable in view of the statute's mandate to reach the most accurate result."); Van Fossen v. Dep't of Housing and Urban Development, 748 F.2d 1579, 1581 (Fed. Cir. 1984) (holding that Merit Systems Protection Board's "failure to consider a significant mitigation circumstance constitutes an abuse of discretion"). Reflecting this principle, this Court has previously recognized that "'in order to ascertain whether action is arbitrary . . . reasons for the choices made among various potentially acceptable alternatives usually need to be explained.'" Bando Chemical Industries, Ltd. v. United States, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992) (quoting Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT 1174, 1177, 704 F. Supp. 1068, 1071 (1988)), aff'd, 26 F.3d 139 (Fed.

Cir. 1994) (unpublished disposition).

Applying these considerations to this case, the Court finds that further explanation is necessary. Although Sidmar's statement that it alone administers Sidfin clearly contradicts a seemingly significant factual basis underpinning the Department's determination that no benefit was conferred,[32] the Department did not explicitly weigh or analyze the significance of this statement. For instance, when Plaintiffs raised this statement before Commerce, the Department simply responded that "[a]s noted above, we have determined that the 1993 capitalization of Sidfin International did not involve a sale of shares or any other potentially countervailable event. Consequently, the valuation methodologies used in this transaction are irrelevant." Final Determination, 64 Fed. Reg. at 15576. Nothing in this explanation addresses the issue of whether Sidmar "controls" Sidfin. Rather, it simply cites to the Department's findings without discussing what, if any, effect Sidmar's statement may have on those findings. Without more, the Court is simply left to conclude that this seemingly important record evidence was not considered by Commerce.

In its Response, Defendant observes that when Commerce asked Sidmar officials about this remark at verification, the Department received the answer that "this statement was 'perhaps a slight exaggeration intended to strengthen Sidmar's company image.'" Defendant's Response at 32-33 (quoting Sidmar Verification Report at 6). According to Defendant, "[t]his explanation, which is not addressed by plaintiffs, undermines plaintiffs' reliance upon the financial statement as support for their argument that Sidmar controlled the joint venture." Id. at 33.

---

[32] Namely, Commerce's finding that "Sidmar does not control the company," Final Determination, 64 Fed. Reg. at 15570.

This explanation, however, reads more into the record than in fact exists. A review of Sidmar's Verification Report confirms that Sidmar officials did characterize their statement about administering Sidfin as a slight exaggeration. See Sidmar Verification Report at 6. Beyond simply noting this response, however, Commerce did not weigh, or even comment upon, the significance of this characterization in its verification report of Sidmar. Nor has Defendant pointed to any other place in the record where Commerce considered this evidence. Thus, Defendant's statement that Sidmar's explanation "undermines plaintiffs' reliance upon the financial statement" constitutes a post hoc rationalization that this Court may not consider. See Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 156 (1991) ("[A]gency 'litigating positions' are not entitled to deference when they are merely . . . counsel's 'post hoc rationalizations' for agency action, advanced for the first time in the reviewing court.").

Accordingly, because there is no evidence that Commerce actually evaluated Sidmar's statement that Sidfin "is administered by our group only," remand is appropriate. On remand, Commerce is instructed to consider the significance of this statement and determine whether, or how, this affects its conclusion that no countervailable benefit was conferred to Sidmar through the creation of Sidfin. In so doing, Commerce shall examine this statement in light of Sidmar's subsequent explanation (noted in Sidmar's Verification Report at 6) that this statement was "perhaps a slight exaggeration intended to strengthen Sidmar's company image," as well as any other relevant record evidence.

b

<u>On Remand, Commerce is Instructed to Clarify its Methodology for Determining</u>
<u>Whether a Benefit Was Conferred Through Sidmar's Participation in the Joint Venture</u>.

In addition to raising a factual question about whether Sidfin was actually controlled by Sidmar, Sidmar's audited financial statement raises a question about the methodology Commerce applied to reach its conclusion.

As noted previously, Plaintiffs' multiple arguments attack the factual basis for Commerce's conclusion that a benefit was not conferred upon Sidmar through its participation in the Sidfin joint venture with Gimvindus. Pursuant to 19 U.S.C. § 1677(5)(B) (1994), a subsidy is conferred when "an authority . . . provides a financial contribution . . . to a person <u>and a benefit is thereby conferred</u>." (emphasis added). Although this statute elaborates on the concept of "benefit conferred" by stating, <u>inter alia</u>, that an equity infusion will normally confer a benefit if the government's investment decision is inconsistent with the normal practice of private investors, 19 U.S.C. § 1677(5)(E)(i) (1994), the statute does not state further what it means to "confer" a benefit or be the "recipient" of a benefit. Nor has Commerce promulgated any regulations on point. Thus, the Court is left to infer from the <u>Final Determination</u> itself what methodology, if any, Commerce employed to make its determination.

In the <u>Final Determination</u> Commerce identified the fact that "the government maintained ownership of ALZ's preference shares," as well as the fact that "Sidmar neither controls the ALZ preference shares contributed to this company nor can profit from the shares," to support its finding. While the question of whether Sidmar owns or can profit from the ALZ shares has obvious relevance to whether a countervailable benefit was conferred to Sidmar, it is not obvious how "control" of Sidfin

would benefit Sidmar.  See Aimcor, Alabama Silicon, Inc. v. United States, 18 CIT 1117, 1120, 871

F. Supp. 447, 451 (1994) ("That [a Venezuelan Government-owned holding company] exercised

some control over [a Venezuelan producer of ferrosilicon] does not necessarily indicate that the benefit

to [the holding company] passed through to [the producer]."), aff'd in part and rev'd in part on other

grounds, 154 F.3d 1375 (Fed. Cir. 1998).  Moreover, the record does not make clear what

significance the question of "control" has compared to the questions of ownership or profits, or what

relevance these two factors have in relation to each other.  Thus, without elaboration, following remand

the Court would find it difficult to assess whether Commerce's findings are supported by substantial

record evidence, should Commerce reverse its finding on this issue of "control."  See Atchinson,

Topeka & Santa Fe Railway Co. v. Wichita Bd. of Trade, 412 U.S. 800, 805 (1973) ("A reviewing

court must be able to discern in the Commission's actions the policy it is now pursuing.").

On remand, therefore, Commerce is further instructed to clarify its methodology for determining

whether a benefit was conferred to Sidmar through the creation of, and its participation in, Sidfin.

Specifically, Commerce is instructed to state why it examined "ownership," "control," and "profit" in

determining whether a countervailing benefit had been conferred, and clarify the relative importance that

it attributed to each of these or other factors.  Should the Department determine upon remand that

Sidmar actually controlled Sidfin, Commerce shall also discuss, in light of its methodology, whether

(and if so, how) Sidmar's control affects its determination that a benefit had not been conferred upon

Sidmar.

**3**

**None of the Other Evidence Identified by Plaintiffs Undermines Commerce's Findings**.

Turning to the last two pieces of record evidence which, Plaintiffs claim, undermine Commerce's factual determination, the Court finds Plaintiffs' arguments unconvincing.

In their brief, Plaintiffs cite the explanation of a Sidmar official that [Sidmar was consolidating its assets] as evidence that "the government structured this transaction to transfer control of ALZ's preference shares to SIDMAR." Plaintiffs' Memorandum at 32 (citing Sidmar Verification Report at 5). Whether or not all of ALZ's assets were consolidated within the Sidmar Group for accounting purposes, however, does not indicate whether Sidmar actually controlled the joint venture or the ALZ preferred shares. In fact, this evidence actually makes clear that the creation of Sidfin did not transfer ownership of the ALZ shares to Sidmar. See Sidmar Verification Report at 6 [Sidmar explained that this transaction is structured in such a way that the Government maintained ownership of ALZ's preference shares]. It also indicates that Sidmar did not have exclusive control over Sidfin's activities. See id. (noting that the chairmanship of the board of Sidfin "alternates annually between the companies," that "the chairman does not have the authority of a deciding vote," and that its statement about exclusively administering Sidfin "was perhaps a slight exaggeration"). Thus, when read in context, the Court does not agree that a remand is necessary for Commerce to consider (or reconsider) this record evidence, since it does not undermine the Department's conclusions.

Finally, and as further alleged evidence that "the GOB sought to transfer control of ALZ's preference shares to SIDMAR to confer an economic benefit on [Sidmar]," Plaintiffs cite a statement

by a [Government official that Sidmar was interested in purchasing the ALZ preference shares].

Plaintiffs' Memorandum at 33 (citing Flanders Verification Report at 11). Once again, however,

Plaintiffs' evidence does not indicate that Sidmar exercised any control over Sidfin, or for that matter

obtained ownership of the ALZ preferred shares. Rather, when read in its entirety, this evidence is

simply silent as to the control of Sidfin, and makes clear that Sidmar did <u>not</u> eventually own the ALZ

preferences shares. <u>See</u> Flanders Verification Report at 11 [explanation by Government official that

the Government retained the full value of its shares] (emphasis added). Thus, the Court does not find

that this evidence undermines the reasonableness of the Department's findings.


**4**


**Should Commerce Decide That Sidmar Received a Countervailable
Subsidy, the Department Must Consider Plaintiffs' Arguments on
How to Measure Whether a Benefit Was Conferred**.


Plaintiffs' final argument concerns the value of the shares that the GOB and Sidmar respectively

contributed to the creation of Sidfin. According to Plaintiffs, "[t]he record shows that the GOB

contributed ALZ's preference shares to the joint venture on preferential terms because SIDMAR

gained partial ownership of assets worth significantly more than its contribution, and the GOB received

shares in the joint venture worth considerably less that its contribution of the ALZ preference shares."

Plaintiffs' Memorandum at 29-30.[33] As support, Plaintiffs note that the GOB incorrectly treated the

---

[33]   At the end of their Memorandum (Section IV.C.2), Plaintiffs argue that, even if Sidmar did
not control the Sidfin joint venture, Sidmar nevertheless "received a benefit . . . because the company
received a 50 percent ownership interest in ALZ's preference shares [confidential numbers] ." Plaintiffs'
Memorandum at 33. At oral argument, Plaintiffs clarified that this is essentially the same argument as
that advanced in Section IV.B. of Plaintiffs' Memorandum. The Court therefore addresses the two
arguments concurrently.

ALZ preferred stock as "debt instruments" when, in order to value its contribution, it figured the net present value of the stocks' minimum redemption price in 2005. Id. at 30. Rather, Plaintiffs say, the value of the preferred shares should have been based on their market value at the time of the transaction. Id.

Responding to this argument in the Final Determination, Commerce stated that since it had "determined that the 1993 capitalization of Sidfin International did not involve a sale of shares or any other potentially countervailable event . . . the valuation methodologies used in this transaction are irrelevant." Final Determination, 64 Fed. Reg. at 15576. Though brief, this explanation is sufficient, should Commerce continue to find on remand that Sidmar did not receive a countervailable benefit from the Sidfin joint venture.

Underlying Plaintiffs' valuation argument is the assumption that Sidmar received a countervailable benefit because it "gained partial ownership of assets worth significantly more than its contribution." Plaintiffs' Memorandum at 29-30 (emphasis added); see also id. at 33 ("SIDMAR received a benefit . . . because the company received a 50 percent ownership interest in ALZ's preference shares . . . ."). As Commerce found, however, [the Government] did not relinquish, and Sidmar did not gain, ownership of assets through the creation of Sidfin. Rather, each side retained full ownership over its respective contributions to the joint venture.

In light of this determination, the Court finds that Commerce acted reasonably in not valuing Gimvindus' preferred shares in ALZ. Simply put, the valuation of assets that were never actually

"conferred" for purposes of 19 U.S.C. § 1677(5)(E) (1994) is, quite obviously, a moot question.[34]

Accordingly, if the Department continues to find on remand that Sidmar did not receive a

countervailable benefit (notwithstanding Sidmar's remarks in its financial statement), the Court will

uphold its decision not to examine the valuation data as being in accordance with law and supported by

substantial record evidence.


A different situation arises, however, if the Department finds that a financial contribution was

conferred to Sidmar. In that case, the question of valuing the ALZ preferred stock would be relevant in

determining whether the financial contribution actually conferred a "benefit" to Sidmar for purposes of

---

[34] In their initial memorandum, Plaintiffs indicate that Sidmar's balance sheet was strengthened through its participation in the Sidfin joint venture, and that this "strengthening" conferred a countervailable benefit on Sidmar. See Plaintiffs' Memorandum at 33 & n.34 (stating that "[t]he GOB was able to accomplish its objectives of . . . strengthening SIDMAR's balance sheet by contributing ALZ's preference shares" and that "[the joint venture] had other economic benefits for SIDMAR such as strengthening its balance sheet"). Whether or not a firm's balance sheet benefitted from its participation in a joint venture with a government entity, however, is also a moot question where, as here, Commerce finds that no beneficial financial contribution for purposes of 19 U.S.C. § 1677(5)(B) (1994) passed between the government and the private party. Rather, in the absence of such a showing under § 1677(5)(B), any benefit that the private party received through its participation is simply of no matter for countervailing duty purposes. See Final Affirmative Countervailing Duty Determination: Stainless Steel Plate in Coils from South Africa, 64 Fed. Reg. 15553 (1999) (finding that, even though two private parties in a joint venture with the South African Government accounted for one-third of the venture's year-end results in their financial statements, the Government's participation did not convey a countervailable subsidy because it participated on terms consistent with the normal practice of private investors).

Thus, if Commerce continues to find that Sidmar did not receive a countervailable benefit from [the Government] on remand, notwithstanding Sidmar's remarks in its financial statement, Commerce need not consider whether Sidmar's balance sheet benefitted from the creation of Sidfin. Should Commerce reverse its finding, however, and find that a countervailable benefit was conferred to Sidmar, Commerce may wish to examine record evidence concerning Sidmar's financial statements to determine whether the government's investment decision was inconsistent with private investment practice, for purposes of 19 U.S.C. § 1677(5)(E), or make any other determination that the Department finds necessary.

19 U.S.C. § 1677(5)(E) (1994). Specifically, under 19 U.S.C. § 1677(5)(E)(i) (1994), Commerce would be required to determine whether **[**the Government's**]** decision was "inconsistent with the ususal investment practice of private investors" in Belgium -- an inquiry for which use of Plaintiffs' proposed valuation methodology may be appropriate.

Because Commerce did not address this matter in the Final Determination, however, it is not appropriate for the Court to do so now. Rather, under the doctrine of primary jurisdiction, the question of what methodology to use in deciding whether **[**the Government's**]** equity infusion was consistent with usual investment practices is one best addressed by Commerce in the first instance. See Union Camp. Corp. v. United States, 53 F. Supp. 2d 1310, 1327 (CIT 1999) ("[P]rimary jurisdiction is appropriately invoked where the question at hand involves complicated issues of administrative policy, practice and procedure that ought best to be resolved by the agency."); Borlem S.A.--Empreedimentos Industriais v. United States, 13 CIT 231, 234, 710 F. Supp. 797, 800 (1989) ("'Primary jurisdiction is a doctrine of common law, wholly court-made, that is designed to guide a court in determining whether and when it should refrain from or postpone the exercise of its own jurisdiction so that an agency may first answer some question presented.'") (quoting Davis, Administrative Law Treatise 81 (2nd Ed., Vol. 4, 1983)), aff'd, 913 F.2d 933 (Fed. Cir. 1990).[35]

---

[35] In United States v. Western Pacific Railroad Co., the Supreme Court stated that

[u]niformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

Western Pacific, 352 U.S. 59, 64-65 (1956) (quoting Far East Conference v. United States, 342 U.S. 570, 574-75 (1952)).

Thus, should Commerce reverse its prior finding on remand and decide that a financial contribution was conferred to Sidmar through the joint venture, the Department is instructed to examine and decide upon the propriety of using Plaintiffs' suggested methodology for          (1) deciding whether a "benefit" was conferred for purposes of 19 U.S.C. § 1677(5)(E)(i) (1994); and; (2) if applicable, valuing the amount of subsidy conferred by Gimvindus.

**IV**

**CONCLUSION**

For the foregoing reasons, the Court remands this case to Commerce for consideration of the issues discussed herein.  In all other respects, the Department's <u>Final Determination</u> is affirmed.

_____

Evan J. Wallach, Judge

Dated:  June 7, 2000
New York, New York